# ILLINOIS OFFICIAL REPORTS

## Supreme Court

***Russell v. SNFA*, 2013 IL 113909**

| | |
|---|---|
| Caption in Supreme Court: | JOHN RUSSELL, as Ex'r of the Estate of Michael Russell, Deceased, Appellee, v. SNFA, Appellant. |
| Docket No. | 113909 |
| Filed | April 18, 2013 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | After the fatal crash of a helicopter, a claim against the French maker of its custom tail-rotor bearing was not lacking in specific personal jurisdiction where, although defendant did not have any direct U.S. customers for its helicopter parts, which were sold through an out-of-state distributor, there were minimum contacts bringing it within the long-arm statute by virtue of multiple sales of its products in Illinois and regular business dealings with an Illinois company, and jurisdiction was reasonable. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Jeffrey Lawrence, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. |

| Counsel on Appeal | Robert Marc Chemers and Scott L. Howie, of Pretzel & Stouffer, Chtrd., of Chicago, and Lisa J. Savitt and Joshua M. Kaplowitz, of Crowell & Moring LLP, of Washington D.C., for appellant. |
| | |
| | Todd A. Smith and Brian LaCien, of Power Rogers & Smith, P.C., of Chicago, for appellee. |
| | |
| Justices | CHIEF JUSTICE KILBRIDE delivered the judgment of the court, with opinion. |
| | Justices Freeman, Karmeier, Burke, and Theis concurred in the judgment and opinion. |
| | Justice Garman dissented, with opinion. |
| | Justice Thomas took no part in the decision. |

## OPINION

¶ 1    This is a products liability action arising from a fatal helicopter crash that occurred in Illinois. Plaintiff sought recovery from a number of entities connected to the accident, including defendant SNFA, a French company that manufactured a custom tail-rotor bearing for the helicopter involved in the crash.

¶ 2    Defendant moved to dismiss plaintiff's action, arguing that Illinois lacked personal jurisdiction over it. The circuit court of Cook County agreed with defendant's jurisdictional challenge and dismissed the action. On appeal, the appellate court reversed, finding that defendant was subject to specific personal jurisdiction in Illinois. 2011 IL App (1st) 093012-B, ¶ 27. For the following reasons, we affirm the judgment of the appellate court.

¶ 3                           I. BACKGROUND

¶ 4    On January 28, 2003, plaintiff-decedent Michael Russell, the sole occupant and pilot of an Agusta 109C helicopter, died after his helicopter crashed in Illinois. Decedent, a resident of Georgia, was living in Illinois and working for Air Angels, Inc., an Illinois air ambulance service operating in the Chicago area, when the fatal accident occurred.

¶ 5    Plaintiff's helicopter was manufactured by Agusta S.p.A. in Italy in 1989. The helicopter contained seven tail-rotor bearings custom made by defendant for that specific model. Between 1989 and 1998, the helicopter had multiple owners and operators.

¶ 6    In 1998, a German company sold the helicopter to Metro Aviation in Louisiana. On two separate instances in 1998 and in 2002, Metro Aviation replaced some of the helicopter's tail-rotor bearings. Metro Aviation purchased the replacement bearings from Pennsylvania-based Agusta Aerospace Corporation, a wholly owned subsidiary of Agusta. As with the

-2-

original bearings, the replacement bearings were manufactured by defendant in France. Thereafter, Metro Aviation sold the helicopter to plaintiff's employer. It is uncontested that plaintiff's helicopter contained tail-rotor bearings manufactured by defendant when it crashed in Illinois.

¶ 7     Plaintiff's estate filed a multicount complaint against numerous defendants, alleging that his helicopter suffered a failure of its tail-rotor bearing, causing it to spin out of control and crash. In relevant part, plaintiff raised strict liability and negligence claims against defendant. Plaintiff filed similar claims against: (1) Metro Aviation, the Louisiana company that sold the helicopter to plaintiff's employer; (2) Agusta S.p.A. (Agusta), the Italian manufacturer of the helicopter; and (3) Agusta Aerospace Corporation (AAC), the Pennsylvania-based distributor and wholly owned subsidiary of Agusta that sold the replacement bearings manufactured by defendant to Metro Aviation.

¶ 8     Thereafter, defendant moved to dismiss plaintiff's claims against it for lack of *in personam* jurisdiction under section 2-301 of the Code of Civil Procedure (735 ILCS 5/2-301 (West 2006)).[1] Specifically, defendant argued that it was not subject to personal jurisdiction in Illinois because there was no allegation of wrongdoing in Illinois by defendant, a French company lacking the requisite contacts with Illinois.

¶ 9     To respond to defendant's motion to dismiss, plaintiff sought jurisdictional discovery. Plaintiff obtained information about defendant's sales, marketing, and distribution activities. Plaintiff also obtained similar information about Agusta and AAC.

¶ 10    It was established during discovery that defendant is a French corporation manufacturing custom-made bearings for the aerospace industry. Specifically, defendant makes bearings for auxiliary power units used in airplanes and for fixed-winged aircraft engines. Defendant also makes bearings for helicopters. Defendant conducts business internationally, with customers in Europe and the United States. Defendant, however, does not have any offices, assets, property, or employees in Illinois, and defendant is not licensed to do business in Illinois.

¶ 11    Agusta, the manufacturer of plaintiff's helicopter, is based in Italy. AAC, the wholly owned subsidiary of Agusta, is located in Pennsylvania and distributes helicopters and component parts internationally and in the United States. Eight different models of Agusta helicopters with defendant's bearings are available for sale in the United States.

¶ 12    In plaintiff's interrogatory to AAC, plaintiff requested information about AAC's distribution or sales of defendant's products in Illinois in the last 10 years. In response, AAC stated that it "sold approximately 2,198 [defendant]-produced parts between 2000 and the date of its response, March 26, 2007." During the past 10 years, five Agusta helicopters were sold to customers located in Illinois. AAC also provided customer service and parts to operators of Agusta aircraft in Illinois.

¶ 13    Defendant sold various custom-made helicopter tail-bearings to Agusta, including the type at issue here. Defendant acknowledged that it was aware that Agusta incorporated

---

[1]Neither Agusta nor AAC challenged personal jurisdiction in Illinois. Metro Aviation moved to dismiss for lack of personal jurisdiction, but its motion was denied.

defendant's bearings into the helicopters sold by Agusta. Agusta provided defendant with precise specifications and then defendant manufactured the tail-rotor bearings accordingly. Agusta also kept some of defendant's bearings to be sold individually. Although defendant knew that Agusta intended to sell defendant's bearings both in helicopters or as individual parts, defendant denied specific knowledge of the final destination of its custom-made helicopter tail-rotor bearings. Defendant does not have any direct United States customers for its custom-made helicopter bearings.

¶ 14 Similar to its helicopter bearings, defendant manufactures bearings for airplanes and fixed-wing aircraft to its customers' specifications. Defendant sells those bearings to customers throughout Europe and to three companies in the United States: (1) Rolls Royce, a jet-engine manufacturer in Indiana; (2) Honeywell, a military and engine manufacturer in Arizona; and (3) Hamilton Sundstrand, an aerospace manufacturer in California. As with its other products, defendant does not exercise control over the products its customers incorporate its bearings into.

¶ 15 Relevant to the issue here, defendant disclosed in an interrogatory that it had a business relationship with Hamilton Sundstrand in Rockford, Illinois, since 1997. Hamilton Sundstrand is a manufacturer of aerospace machinery and is a part of the United Technology Corporation. Defendant explained that it sold Hamilton Sundstrand aerospace bearings, but not the same model or type of bearings in defendant's helicopter.

¶ 16 Plaintiff took two depositions of defendant's employee, Frederic Ponchon, who was responsible for selling defendant's products in the United States, Canada, and certain parts of Asia and Europe. Ponchon explained that Hamilton Sundstrand had multiple locations throughout the United States, including divisions or locations in Rockford, Illinois, and San Diego, California. Ponchon personally attended at least three meetings with Hamilton Sundstrand in Rockford about defendant's products and Hamilton Sundstrand's payment systems. Ponchon further explained that he sought to sell a certain type of bearing to the Rockford location but was unable to complete the sale.

¶ 17 Ponchon stated that defendant sold its aerospace bearings to Hamilton Sundstrand, who incorporated defendant's bearings into Hamilton Sundstrand aerospace products, including auxiliary power units. Ponchon claimed that defendant's bearings sold to Hamilton Sundstrand were shipped to San Diego and that the Rockford location only processed payments.

¶ 18 A purchasing agreement between defendant and Hamilton Sundstrand lists Rockford, Illinois, as the buying and buyer agent location. Similarly, the proprietary sharing agreement or contract between defendant and Hamilton Sundstrand identifies Hamilton Sundstrand's place of business to be "4747 Harrison Avenue, Rockford, Illinois 61106" and states that proprietary information disclosed by defendant will be shared with an employee located in Rockford, Illinois. The proprietary agreement expressly provides that "[t]his agreement shall be governed by and interpreted under the internal laws of the state of Illinois, U.S.A."

¶ 19 When asked about defendant's business relationship with Agusta, Ponchon acknowledged that he knew that Agusta sold helicopters that contained defendant's bearings in the United States. Ponchon denied, however, knowing whether any Agusta helicopters

were sold in Illinois.

¶ 20    Plaintiff also obtained defendant's invoices and sales documents on defendant's sales to Hamilton Sundstrand. During an approximately four-year period, between July 2001 and February 2005, defendant sold products totaling approximately $1 million to Hamilton Sundstrand in a number of separate shipments. The invoices listed Hamilton Sundstrand's business address as Rockford, Illinois, and a delivery address in San Diego, California.

¶ 21    Ultimately, the circuit court granted defendant's motion to dismiss for lack of jurisdiction. The court concluded that defendant did not have sufficient contacts with Illinois.

¶ 22    On appeal, the appellate court reversed the circuit court's judgment. *Russell v. SNFA*, 408 Ill. App. 3d 827 (2011). This court, however, vacated the appellate court's judgment and directed it to reconsider in light of the United States Supreme Court's decisions in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. ___, 131 S. Ct. 2846 (2011), and *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. ___, 131 S. Ct. 2780 (2011) (plurality op.). Russell v. SNFA, No. 112323 (Sept. 28, 2011) (supervisory order).

¶ 23    On reconsideration, the appellate court again reversed the circuit court's dismissal for lack of personal jurisdiction, finding that *Goodyear* and *McIntyre* supported its original decision. 2011 IL App (1st) 093012-B, ¶ 2. The court relied heavily on *Rockwell International Corp. v. Costruzioni Aeronautiche Giovonni Agusta, S.p.A.*, 553 F. Supp. 328 (E.D. Pa. 1982), a case involving almost identical facts, in finding that Illinois' exercise of jurisdiction over defendant was proper. 2011 IL App (1st) 093012-B, ¶ 36. The court further found that its holding was consistent with the United States Supreme Court's observation in *McIntyre* that "distribution by an American distributor in the states could be sufficient to establish jurisdiction, given the right set of facts." 2011 IL App (1st) 093012-B, ¶ 45.

¶ 24    This court allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).


¶ 25                                    II. ANALYSIS

¶ 26    On appeal, defendant argues that the appellate court erred when it reversed the circuit court's judgment dismissing plaintiff's action for lack of personal jurisdiction. Defendant contends that Illinois cannot exercise specific personal jurisdiction because defendant lacks the requisite "minimum contacts" with Illinois, the accident did not arise from defendant's contact with Illinois, and it would be unreasonably burdensome to require defendant to defend itself in Illinois. Defendant asserts that the appellate court misinterpreted *McIntyre* and erroneously relied on *Rockwell*, a 1982 Pennsylvania federal case employing a standard rejected by *McIntyre*. Defendant further argues that Illinois cannot exercise general personal jurisdiction because there is no evidence that defendant had the necessary "continuous and systemic" contacts with Illinois.

¶ 27    Plaintiff responds that the appellate court properly found that defendant was subject to specific personal jurisdiction in Illinois under applicable provisions of the Illinois long-arm statute (735 ILCS 5/2-209(a), (c) (West 2002)). Plaintiff argues that the appellate court's judgment comports with federal and Illinois due process concerns because defendant has more than sufficient minimum contacts with Illinois, the cause of action arose from or relates

-5-

to those contacts, and it is reasonable to require defendant to litigate in Illinois. Plaintiff further argues that defendant is subject to general personal jurisdiction because it has continuous and systemic contacts with Illinois.

¶ 28 It is settled that the plaintiff has the burden to establish a *prima facie* basis to exercise personal jurisdiction over a nonresident defendant. *Wiggen v. Wiggen*, 2011 IL App (2d) 100982, ¶ 20. When, as here, the circuit court decides a jurisdictional question solely on documentary evidence, without an evidentiary hearing, our review is *de novo*. *Id*. ¶ 20. Any conflicts in the pleadings and affidavits must be resolved in the plaintiff's favor, but the defendant may overcome plaintiff's *prima facie* case for jurisdiction by offering uncontradicted evidence that defeats jurisdiction. *Id*. ¶ 20.

¶ 29 Section 2-209 of the Code of Civil Procedure, commonly referred to as the Illinois long-arm statute, governs the exercise of personal jurisdiction by an Illinois court over a nonresident and is divided into three subsections identifying multiple grounds for exercising jurisdiction. See 735 ILCS 5/2-209(a), (b), (c) (West 2002). Historically, this court has employed a two-part analysis in deciding a jurisdictional issue under the long-arm statute, first determining whether a specific statutory provision of section 2-209 has been satisfied, and then determining whether the due process requirements of the United States and Illinois Constitutions have been met. *Rollins v. Ellwood*, 141 Ill. 2d 244, 275 (1990).

¶ 30 The year before *Rollins* was decided, however, the General Assembly substantively amended the long-arm statute by adding subsection (c), effective September 7, 1989. 735 ILCS 5/2-209(c) (West 2002). Subsection (c), commonly referred to as the "catch-all provision," broadly provides that a court "may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c) (West 2002). In consideration of that amendment, our appellate court has found that *Rollins*'s two-part analysis is no longer necessary when subsection (c) is invoked because it constitutes an independent basis for exercising personal jurisdiction that effectively collapses the jurisdictional inquiry into the single issue of whether a defendant's Illinois contacts are sufficient to satisfy federal and Illinois due process. See, *e.g.*, *Soria v. Chrysler Canada, Inc.*, 2011 IL App (2d) 101236, ¶ 16; *Morgan, Lewis & Bockius LLP v. City of East Chicago*, 401 Ill. App. 3d 947, 952 (2010); *Old Orchard Urban Ltd. Partnership v. Harry Rosen, Inc.*, 389 Ill. App. 3d 58, 64 (2009); *Knaus v. Guidry*, 389 Ill. App. 3d 804, 814 (2009); *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 357 Ill. App. 3d 381, 386-87 (2005); *Alderson v. Southern Co.*, 321 Ill. App. 3d 832, 856 (2001); *Weiden v. Benveniste*, 298 Ill. App. 3d 531, 533 (1998); see also *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010) (concluding that under subsection (c) "the state statutory and federal constitutional inquiries merge"). We agree. Thus, when, as here, a plaintiff argues that personal jurisdiction is proper under subsection (c) of the Illinois long-arm statute, the sole issue before the court is whether the nonresident defendant's connection or contact with Illinois is sufficient to satisfy federal and Illinois due process.

¶ 31 Before turning to that issue, though, we must clarify another part of our decision in *Rollins*. In *Rollins*, we observed that "Illinois' long-arm statute is to be given a definite meaning and scope which does not fluctuate with every new pronouncement on the limits of Federal due process." *Rollins*, 141 Ill. 2d at 271 (citing *Green v. Advance Ross Electronics*

*Corp.*, 86 Ill. 2d 431, 436 (1981)). We instructed courts deciding whether personal jurisdiction should be exercised under the long-arm statute to consider the Illinois long-arm statute "separately" from federal due process standards. *Rollins*, 141 Ill. 2d at 271. Consequently, we concluded that the Illinois long-arm statute "may well restrict the power that the courts of this State have to bring nonresidents before them to a greater extent than do the Federal due process clause and the 'minimum contacts' standard developed over the years by the Supreme Court." *Rollins*, 141 Ill. 2d at 271-72. *Rollins* suggests that, in the context of personal jurisdiction over nonresident defendants, due process protection under the Illinois long-arm statute may be greater than federal due process protections.

¶ 32 Since our decision in *Rollins*, however, there have been no decisions from this court or the appellate court identifying any substantive difference between Illinois due process and federal due process on the issue of a court's exercising personal jurisdiction over a nonresident defendant. When interpreting Illinois law on personal jurisdiction, the Seventh Circuit has observed that "in no case post-*Rollins* has an Illinois court found federal due process to allow the exercise of jurisdiction in a case where Illinois limits [or] prohibit[s] it." *Hyatt International Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002). Similarly, also in the context of the Illinois long-arm statute, a federal district court has concluded "that it is only in the rare (and perhaps hypothetical) case that the federal due process analysis might actually differ from the Illinois due process analysis." *GMAC Real Estate, LLC v. E.L. Cutler & Associates, Inc.*, 472 F. Supp. 2d 960, 964 (N.D. Ill. 2006).

¶ 33 Defendant, as the party challenging personal jurisdiction here, does not argue that it is entitled to greater due process protections under the Illinois due process clause and long-arm statute. Therefore, we do not need to determine in this case the extent, if any, that Illinois due process protections differ from federal due process protections on the issue of personal jurisdiction. Accordingly, we will not consider our long-arm statute separately from federal due process concerns.

¶ 34 The United States Supreme Court has observed that "[t]he Due Process Clause of the Fourteenth Amendment sets the outer boundaries of a state tribunal's authority to proceed against a defendant." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. ___, ___, 131 S. Ct. 2846, 2853 (2011). In all cases involving a nonresident defendant, before a court may subject the defendant to a judgment *in personam*, "due process requires that the defendant have certain minimum contacts with the forum State such that maintenance of the suit there does not offend 'traditional notions of fair play and substantial justice.' " *Wiles v. Morita Iron Works Co.*, 125 Ill. 2d 144, 150 (1988) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). We therefore must consider whether defendant has minimum contacts with Illinois and whether subjecting it to litigation in Illinois is reasonable under traditional notions of fair play and substantial justice.

¶ 35                                    A. Minimum Contacts
¶ 36 This court recognizes the "minimum contacts" test as the threshold issue in any personal jurisdiction challenge in Illinois. *Wiles*, 125 Ill. 2d at 161. In turn, the relevant inquiry into whether the minimum contacts test has been satisfied depends on what category of personal

jurisdiction is being sought—either general or specific. *Keller v. Henderson*, 359 Ill. App. 3d 605, 613 (2005). General jurisdiction for a corporate defendant exists when it has engaged in continuous and substantial business activity within the forum, the paradigm example for a corporation being a location where it "is fairly regarded as at home." *Goodyear*, 564 U.S. at ___, 131 S. Ct. at 2853-54. A finding of general jurisdiction permits a cause of action against a defendant based on activity that is entirely distinct from its activity in the forum. *Goodyear*, 564 U.S. at ___, 131 S. Ct. at 2853. Consequently, the standard for finding general jurisdiction is very high and requires a showing that the nonresident defendant carried on systemic business activity in Illinois "not casually or occasionally, but with a fair measure of permanence and continuity." *Morgan, Lewis & Bockius LLP v. City of East Chicago*, 401 Ill. App. 3d 947, 953 (2010); see also *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012) (explaining that "the threshold for general jurisdiction is quite high because 'the contacts must be sufficiently extensive and pervasive to approximate physical presence' " (quoting *Tamburo*, 601 F.3d at 701)). Essentially, this means that, "the foreign corporation has taken up residence in Illinois." (Internal quotation marks omitted.) *Morgan*, 401 Ill. App. 3d at 953.

¶ 37 Although the appellate court declined to decide whether general jurisdiction exists here (2011 IL App (1st) 093012-B, ¶ 27), after reviewing the evidence under the applicable high standard, we find that it does not. Defendant is a French corporation that manufactures custom-made bearings for the aerospace industry. Defendant sells its products internationally, including in the United States, but defendant does not have any offices, assets, property, or employees in Illinois. Nor is defendant licensed to do business in Illinois.

¶ 38 In other words, there is no evidence showing that defendant engaged in the type of permanent and systemic business activity in Illinois that would justify a finding of general jurisdiction. Simply put, we cannot conclude that Illinois could be fairly regarded as defendant's home. See *Goodyear*, 564 U.S. at ___, 131 S. Ct. at 2854. Therefore, we necessarily conclude that Illinois cannot exercise general jurisdiction over defendant.

¶ 39 The second type of personal jurisdiction is specific jurisdiction, the type the appellate court determined was applicable here. As the parties' respective arguments demonstrate, the key issue in this appeal is specific personal jurisdiction.

¶ 40 Specific jurisdiction requires a showing that the defendant purposefully directed its activities at the forum state and the cause of action arose out of or relates to the defendant's contacts with the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Under specific jurisdiction, a nonresident defendant may be subjected to a forum state's jurisdiction based on certain " 'single or occasional acts' " in the state but only with respect to matters related to those acts. *Goodyear*, 564 U.S. at ___, 131 S. Ct. at 2853 (quoting *International Shoe*, 326 U.S. at 318).

¶ 41 In *Burger King Corp.*, the United States Supreme Court explained the rationale for permitting the exercise of specific personal jurisdiction over a nonresident defendant who "purposefully directs" its activities toward the forum, even if only for single or occasional acts in the forum state. First, the state has a manifest interest in providing its residents with a convenient forum for redressing injuries caused by nonresidents. Second, when a

nonresident defendant purposefully derives benefit from its interstate activities in other jurisdictions it would be unfair to allow that defendant to avoid any legal consequences that proximately arose from those same activities. *Burger King Corp.*, 471 U.S. at 473-74.

¶ 42    Noting that a potential nonresident defendant should be able to "reasonably anticipate" being drawn into litigation in the foreign forum, the Court explained the central underpinning of specific jurisdiction as follows:

> " 'The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Burger King Corp.*, 471 U.S. at 474-75 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

The Court further explained that requiring a showing of "purposeful availment" within the forum state protects a nonresident defendant from being haled into a jurisdiction based on random or attenuated contacts or the unilateral activity of a third party. *Burger King Corp.*, 471 U.S. at 475.

¶ 43    Relevant here, one way to satisfy the requirements for specific jurisdiction is under the "stream of commerce" theory, an approach first recognized by the United States Supreme Court in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980).[2] In that decision, the Court concluded as follows:

> "[I]f the sale of a product by a manufacturer or a distributor *** is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." *World-Wide Volkswagen*, 444 U.S. at 297.

Under those circumstances, the forum state is permitted to exercise personal jurisdiction over a nonresident defendant "that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World-Wide Volkswagen*, 444 U.S. at 297-98.

¶ 44    Applying those principles to the facts in *World-Wide Volkswagen*, however, the Court found that an Oklahoma state court could not exercise personal jurisdiction "over a nonresident automobile retailer and its wholesale distributor in a products-liability action, when the defendants' only connection with Oklahoma is the fact that an automobile sold in

---

[2]We note that this court recognized the "stream of commerce" theory for establishing personal jurisdiction before *World-Wide Volkswagen* was decided. *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill. 2d 432 (1961); see also *World-Wide Volkswagen*, 444 U.S. at 297-98 (referring favorably to *Gray*); *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 120 (1987) (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall and Blackmun, JJ.) (describing *Gray* as "a well-known stream-of-commerce case").

New York to New York residents became involved in an accident in Oklahoma." *World-Wide Volkswagen*, 444 U.S. at 287. In particular, the nonresident defendants' markets were limited to New York, New Jersey, and Connecticut and there was no evidence in the record that any automobiles were sold to customers outside that area, let alone Oklahoma. Finally, even if it were foreseeable that a vehicle sold by defendants would be driven or used by a consumer in Oklahoma, the Court deemed that basis of foreseeability insufficient to satisfy the requisite minimum contact standard. *World-Wide Volkswagen*, 444 U.S. at 298.

¶ 45    As the parties here acknowledge, however, the evolution of the stream-of-commerce theory has not been consistent. Notably, seven years after deciding *World-Wide Volkswagen*, the United States Supreme Court issued a fractured opinion on the issue in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987). In *Asahi*, the plaintiff was injured in a motorcycle accident in California, and he filed a lawsuit against the Taiwanese manufacturer of the motorcycle tires' inner tubes. The Taiwanese manufacturer then filed a cross-complaint against Asahi, the Japanese manufacturer of the tube's valve assembly. Ultimately, however, the plaintiff's claims were settled and dismissed, leaving only the indemnity action between the Taiwanese and Japanese defendants before the California court. Thus, the issue before the United States Supreme Court was whether a California court could exercise personal jurisdiction over the Taiwanese and Japanese defendants in the indemnity action. *Asahi*, 480 U.S. at 105-06, 115. The Court unanimously held that the California court could not exercise personal jurisdiction over the indemnity dispute between the Taiwanese and Japanese defendants because it would be unreasonable and unfair. *Asahi*, 480 U.S. at 113, 116; 121 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall and Blackmun, JJ.).

¶ 46    On the separate issue of "minimum contacts" and the proper application of the stream-of-commerce theory, however, the Court could not reach a consensus and issued three separate opinions. The first approach was advanced by Justice O'Connor, joined by Chief Justice Rehnquist and Justices Powell and Scalia. Justice O'Connor concluded that minimum contacts did not exist, and rejected the Supreme Court of California's broad application of the stream-of-commerce theory that would permit the exercise of personal jurisdiction whenever a defendant places its product into the stream of commerce with only the knowledge or awareness that the product could potentially reach the forum state. *Asahi*, 480 U.S. at 111-12 (opinion of O'Connor, J.).

¶ 47    Instead, Justice O'Connor argued that the stream-of-commerce theory required a showing that the defendant purposefully directed its product at the forum through additional conduct. Under Justice O'Connor's approach, a defendant's awareness or knowledge that the stream of commerce would bring its product into the forum was insufficient, standing alone, to establish minimum contacts. Rather, Justice O'Connor believed that some type of additional conduct was necessary to establish purposeful direction toward the forum. Examples of conduct that would indicate an intent or purpose to serve the market in the forum state include designing the product for the market in the forum, advertising in the forum, establishing channels for providing regular advice to customers in the forum, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum. *Asahi*, 480 U.S. at 110-12 (opinion of O'Connor, J.).

¶ 48 Applying that rule in *Asahi*, Justice O'Connor found that minimum contacts were lacking when there was no evidence that defendant Asahi conducted business in California and it did not have any office, agents, employees, or property in California. Nor did Asahi create, control, or employ the distribution system that brought its valves to California. Finally, Justice O'Connor noted that "[t]here is no evidence that Asahi designed its product in anticipation of sales in California." *Asahi*, 480 U.S. at 112-13 (opinion of O'Connor, J.).

¶ 49 In a separate opinion in *Asahi*, Justice Brennan, joined by Justices White, Marshall, and Blackmun, rejected Justice O'Connor's narrow interpretation of the stream-of-commerce theory and her conclusion that Asahi did not purposefully avail itself of the California market. Justice Brennan argued that the stream-of-commerce theory did not require the "additional conduct" proposed by Justice O'Connor. *Asahi*, 405 U.S. at 117 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall and Blackmun, JJ.).

¶ 50 Noting that the stream of commerce referred to the regular and anticipated flow of products from manufacture to distribution to retail sale, Justice Brennan concluded that when the defendant was aware the final product was being marketed in the forum, the possibility of a lawsuit there could not be a surprise. Similarly, litigation in that forum would not present a burden with no corresponding economic benefit. Thus, in Justice Brennan's opinion, the additional conduct test proposed by Justice O'Connor was unnecessary and did not comport with *World-Wide Volkswagen*. Applying his broader test, Justice Brennan found that minimum contacts with California existed because "[a]lthough Asahi did not design or control the system of distribution that carried its valve assemblies into California, Asahi was aware of the distribution system's operation, and it knew that it would benefit economically from the sale in California of products incorporating its components." *Asahi*, 405 U.S. at 117-18, 121 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall and Blackmun, JJ.).

¶ 51 The third opinion on the minimum contacts issue in *Asahi*, authored by Justice Stevens, and joined by Justices White and Blackmun, argued that the Court should not even reach the minimum contacts issue because the Court unanimously agreed that it would be unreasonable and unfair to require the foreign defendants to resolve their indemnity dispute in a California court, and those grounds alone warranted reversal. *Asahi*, 405 U.S. at 121 (Stevens, J., concurring in part and concurring in the judgment, joined by White and Blackmun, JJ.).

¶ 52 After *Asahi* was decided, the lower federal and state courts struggled to reconcile its competing standards for the stream-of-commerce theory. Indeed, in *Wiles*, this court described *Asahi* as "extremely balkanized" and noted that *Asahi* presented two competing versions of the stream-of-commerce theory, a narrow theory advanced by Justice O'Connor and a broad theory advanced by Justice Brennan. *Wiles*, 125 Ill. 2d at 156-57.

¶ 53 We explained that, under the narrow theory, a nonresident defendant does not establish minimum contacts with the forum unless it engages in additional conduct beyond merely placing products into the stream of commerce. In contrast, under the broad theory, minimum contacts between a nonresident defendant and the forum state are established when the defendant participates in the regular and anticipated flow of products from manufacture to

distribution to retail sale and the defendant is aware that the final product is being marketed in the forum state. *Wiles*, 125 Ill. 2d at 157 (citing *Asahi*, 480 U.S. at 112; 117 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall and Blackmun, JJ.).

¶ 54 Recognizing the tension between the two competing stream-of-commerce theories in *Asahi*, this court declined to decide what approach was correct or adopt either of the approaches for Illinois. We did note, however, that "[u]nder either interpretation of the stream of commerce theory, it is clear that purposeful availment of the forum's market requires, at a *minimum*, that the alien defendant is '*aware* that the final product is being marketed in the forum State.' " (Emphases in original.) *Wiles*, 125 Ill. 2d at 160 (quoting *Asahi*, 480 U.S. at 117 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall and Blackmun, JJ.).

¶ 55 Applying that standard to the facts in *Wiles*, we found that the Japanese defendant did not have the requisite minimum contacts with Illinois. In *Wiles*, the plaintiff was injured by a machine at his employer's plant in Illinois. Plaintiff's employer had purchased the machine in Japan from defendant, a Japanese machine manufacturer. After reviewing the facts in *Wiles*, we observed that the record was "totally devoid" of any evidence that the Japanese defendant was "aware either during contract negotiations or at the time of delivery of the products to [plaintiff's employer] in Japan that [plaintiff's employer] intended to transport two of the [machines] to Illinois, or that [plaintiff's employer] even had a plant in Illinois." *Wiles*, 125 Ill. 2d at 147, 160.

¶ 56 In other words, the Japanese defendant had absolutely no knowledge that its product, purchased in Japan, might be destined for Illinois. Instead, the defendant's product was brought into Illinois "solely" by the unilateral act of the plaintiff's employer. Because the unilateral action of a third party does not satisfy the minimum contacts standard, we necessarily found that the plaintiff's action against the Japanese defendant should be dismissed for lack of personal jurisdiction. *Wiles*, 125 Ill. 2d at 160, 163.

¶ 57 *Wiles* represents the last time that this court has discussed the stream-of-commerce theory. Recently, however, the United States Supreme Court substantively revisited the theory in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. ___, 131 S. Ct. 2780 (2011).

¶ 58 In *McIntyre*, the plaintiff, a New Jersey resident, was injured at his workplace in New Jersey while operating a metal-shearing machine manufactured by defendant, a manufacturer based in England. The defendant did not market its products in New Jersey nor did it ship the products there. Instead, it used an independent Ohio-based distributor to sell its products in the United States. Although the defendant sold its products exclusively through the American distributor and did not sell directly to any other customer in the United States, the defendant did not have any control over the American distributor. The defendant also attended various trade shows with the American distributor in the United States but none in New Jersey. Plaintiff's employer bought a single machine from the American distributor of defendant's products. *McIntyre*, 564 U.S. at ___, ___, 131 S. Ct. at 2782-83, 2791.

¶ 59 Based on these facts, six justices of the Court in *McIntyre* found that the New Jersey court could not exercise specific personal jurisdiction over the British defendant and reversed

the New Jersey Supreme Court's contrary judgment. *McIntyre*, 564 U.S. at ___, ___, 131 S. Ct. at 2791, 2795. Critically, though, the six justices did not agree on a rationale for reversing the lower court's judgment, particularly on the application of the stream-of-commerce theory.

¶ 60        In a plurality opinion joined by Chief Justice Roberts, Justice Scalia, and Justice Thomas, Justice Kennedy endorsed the narrow stream-of-commerce theory articulated by Justice O'Connor in *Asahi*. *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2790. Justice Kennedy acknowledged *World-Wide Volkswagen*'s instruction that a defendant's act of placing goods into the stream of commerce with the expectation that they might be purchased by consumers in the forum state may indicate purposeful availment, but argued that *World-Wide Volkswagen* did "not amend the general rule of personal jurisdiction." *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2788.

¶ 61        Instead, Justice Kennedy explained that the stream-of-commerce theory "merely observes that a defendant may in an appropriate case be subject to jurisdiction without entering the forum—itself an unexceptional proposition—as where manufacturers or distributors 'seek to serve' a given State's market." *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2788. In Justice Kennedy's view, the principal inquiry in all specific jurisdiction cases is whether the defendant's activity manifests an intention to submit to the sovereign's power by showing that the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (Internal quotation marks omitted.) *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2788. Thus, in the context of the stream-of-commerce theory, a defendant's transmission of goods permits the exercise of jurisdiction only when the defendant targets the forum. Generally, then, "it is not enough that the defendant might have predicted that its goods will reach the forum State." *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2788.

¶ 62        Justice Kennedy also criticized the broader stream-of-commerce theory articulated by Justice Brennan's concurrence in *Asahi* for improperly making fairness and foreseeability the touchstones of jurisdiction. Specifically, Justice Kennedy stated that "Justice Brennan's concurrence, advocating a rule based on general notions of fairness and foreseeability, is inconsistent with the premises of lawful judicial power. This Court's precedents make clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2789.

¶ 63        In a concurring opinion, Justices Breyer and Alito agreed with the plurality that the New Jersey court could not exercise personal jurisdiction, but disagreed with the plurality's "strict rules" to limit jurisdiction. The concurring justices believed that the case should be decided on the Court's precedents rather than making a new pronouncement that would "refashion basic jurisdictional rules." *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment, joined by Alito, J.).

¶ 64        Applying those precedents to the facts in *McIntyre*, the concurrence concluded that none of the Court's precedents supported a finding that a single isolated sale, even if accompanied by efforts to make sales anywhere in the United States, was sufficient to establish personal jurisdiction. Moreover, there was no evidence of a regular flow of sales to New Jersey and no "something more," such as special state-related design, advertising, advice, or marketing.

*McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment, joined by Alito, J.) (quoting *Asahi*, 480 U.S. at 111).

¶ 65     The concurrence further explained that, while it disagreed with the plurality's "seemingly strict no-jurisdiction rule," it also disagreed with the stream-of-commerce theory accepted by the New Jersey Supreme Court. Expressing concern for the implications of small manufacturers, the concurrence rejected an overly broad interpretation of the stream-of-commerce theory that would subject a manufacturer to jurisdiction as long as it "knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states." (Emphasis in original; internal quotation marks omitted.) *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment, joined by Alito, J.). Ultimately, the concurrence explicitly chose to base its decision on the Court's precedents, rejected the plurality's reasoning, and declined to express a different approach for the stream-of-commerce theory. *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2794 (Breyer, J., concurring in the judgment, joined by Alito, J.).

¶ 66     In dissent, Justice Ginsburg, joined by Justices Sotomayor and Kagan, argued that the New Jersey court could properly exercise jurisdiction over the English-based defendant under *International Shoe* and the Court's subsequent decisions. The dissent asserted that *International Shoe* ushered in the modern approach to jurisdiction over corporations and afforded significant consideration to reason and fairness. Because the defendant engaged an American-based distributor, the dissent would find that it "purposefully availed itself" of the entire United States market, thereby availing itself of each of the individual states where its distributor sold its products for purposes of a jurisdiction analysis. The dissent observed that both federal and state courts, when presented with similar facts, have held that it "would undermine principles of fundamental fairness to insulate the foreign manufacturer from accountability in court at the place within the United States where the manufacturer's products caused injury." *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2795-804 (Ginsburg, J., dissenting, joined by Sotomayor and Kagan, JJ.).

¶ 67     Having carefully reviewed *McIntyre*, we believe that the following points can be deciphered from its three separate opinions. First, the Court unanimously endorsed the continued validity of the stream-of-commerce theory from *World-Wide Volkswagen* to establish specific personal jurisdiction, although the proper application of that theory is not settled. *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2787-89; 564 U.S. at ___, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment, joined by Alito, J.); 564 U.S. at ___, 131 S. Ct. at 2798-99 (Ginsburg, J., dissenting, joined by Sotomayor and Kagan, JJ.); see also *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. ___, ___, 131 S. Ct. 2846, 2855 (2011) (although a general personal jurisdiction case, a unanimous court reaffirmed *World-Wide Volkswagen*'s stream-of-commerce analysis on questions of specific personal jurisdiction).

¶ 68     Second, a clear majority of the Court, six justices, rejected the New Jersey Supreme Court's stream-of-commerce theory. Thus, going forward, specific jurisdiction should *not* be exercised based on a single sale in a forum, even when a manufacturer or producer "knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states."

-14-

(Emphasis in original; internal quotation marks omitted.) *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment, joined by Alito, J.); see also *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2785-88 (plurality criticizing New Jersey Supreme Court's approach and then concluding that "it is not enough that the defendant might have predicted that its goods will reach the forum State"). We note that this outcome is consistent with this court's conclusion in *Wiles* that the competing opinions in *Asahi* required "at a *minimum*, that the alien defendant is '*aware* that the final product is being marketed in the forum State.'" (Emphases in original.) *Wiles*, 125 Ill. 2d at 160 (quoting *Asahi*, 480 U.S. at 117 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall and Blackmun, JJ.)).

¶ 69    Finally, a minority of the Court believes that a broader stream-of-commerce theory should be applied to adapt to modern globalized commerce and is warranted under *International Shoe*'s focus on "notions of fair play and substantial justice." *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2804 (Ginsburg, J., dissenting, joined by Sotomayor and Kagan, JJ.). Of course, even if we agreed that this is the proper approach to take, we could not adopt it here because it is currently the minority position in the United States Supreme Court. See *supra* ¶ 33 (concluding that "we will not consider our long-arm statute separately from federal due process concerns" under the circumstances of this case).

¶ 70    Aside from those observations, though, *McIntyre* has not definitively clarified the proper application of the stream-of-commerce theory. We disagree with defendant's contention before this court that Justice Breyer's concurrence in *McIntyre* should be construed as adopting Justice O'Connor's narrow construction. While the plurality certainly favored that construction (*McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2790), Justice Breyer explicitly declined to announce any new jurisdictional rules and, instead, believed "the outcome of this case is determined by our precedents." *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2791 (Breyer, J., concurring in the judgment, joined by Alito, J.).

¶ 71    To the extent that Justice Breyer applied Justice O'Connor's approach to the facts in *McIntyre*, Justice Breyer did so to illustrate that dismissal was proper under both the broad and narrow theories of the stream of commerce. See *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment, joined by Alito, J.) (discussing the "separate opinions" in *Asahi* and then applying the standards in those opinions to the facts in *McIntyre*). Moreover, Justice Breyer quite clearly disagreed with the plurality's decision to rely on "strict rules" to limit jurisdiction to only situations when the defendant intended to submit to a state's sovereign power. See *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment, joined by Alito, J.) (criticizing the plurality's position). In light of this disagreement, we cannot say that Justice Breyer intended to endorse, or otherwise adopt, Justice O'Connor's narrow construction of the stream-of-commerce theory. Accordingly, as in *Wiles*, we will not adopt either the broad or narrow version of the theory without more definitive guidance from a majority of the United States Supreme Court.

¶ 72    Having extensively analyzed the relevant authority, we now consider the facts of this case to determine whether plaintiff has met his burden to show that defendant has the requisite minimum contacts with Illinois. Initially, for purposes of the stream-of-commerce theory, we agree with the appellate court that Agusta and its American subsidiary, AAC, effectively

-15-

operated as an American distributor for defendant's tail-rotor bearings in the United States market. Thus, we reject defendant's contention that the actions of Agusta and AAC are irrelevant to our determination of personal jurisdiction.

¶ 73   As defendant acknowledges, defendant custom manufactured the bearings at issue *specifically* for Agusta. Agusta provides defendant with the specifications and defendant manufactures the bearings accordingly. Agusta, in turn, incorporates defendant's bearings into helicopters and sells those helicopters internationally, including in the United States through its American subsidiary, AAC. Consequently, the *sole* market for defendant's bearings of this type would be Agusta or an owner of an Agusta helicopter that needed to replace those bearings. In other words, the *only* way that defendant's product, custom-made helicopter tail-rotor bearings, would ever reach the final consumer, including consumers in the United States and Illinois, was through Agusta and its American distributor AAC.

¶ 74   In fact, defendant concedes that it has no direct American customers for these specific bearings. Therefore, without Agusta and AAC, defendant would have no market or corresponding sales of those bearings anywhere in the United States. Indeed, defendant's product reached Illinois through this distribution network—the Louisiana company that sold the helicopter to plaintiff's employer purchased replacement tail-rotor bearings from AAC, Agusta's American distributor. Under these circumstances, we agree with the appellate court's assessment of defendant's relationship with Agusta and AAC, as follows:

> "In essence, Agusta is the marketer and distributor to the consumer of their joint and ultimate product. [Defendant] has chosen to leave to Agusta the marketing and distribution to the consumer. Agusta is thus the conduit through which this [defendant's] product, custom-made for Agusta, reaches the ultimate consumers." 2011 IL App (1st) 093012-B, ¶ 41.

¶ 75   Furthermore, defendant acknowledges that Agusta and AAC sold defendant's bearings throughout the world, including the United States. In the past 10 years, five Agusta helicopters were sold in Illinois. Moreover, during a seven-year period, between 2000 and 2007, AAC sold approximately 2,198 parts manufactured by defendant to entities located in Illinois.

¶ 76   We are not the only court to conclude that, for purposes of a stream-of-commerce analysis, Agusta and its American distributor AAC act as defendant's distributors. Presented with almost identical facts to those present here, a federal district court in Pennsylvania rejected defendant's argument that because it confined its sales to Agusta in the European market it had not "purposefully availed itself of the privileges of conducting business within Pennsylvania." *Rockwell International Corp. v. Costruzioni Aeronautiche Giovanni Agusta, S.p.A.*, 553 F. Supp. 328, 331 (E.D. Pa. 1982). Assessing defendant's business relationship with Agusta, the *Rockwell* court concluded:

> "While [defendant's] involvement in the sale and distribution of the ball bearing may be once or twice removed from Agusta's final sale to [the plaintiff], [defendant's] purposeful availment, critical in the minimum contacts analysis, actually took place at an earlier point. That occurred when [defendant] decided to enter and exploit the international 'executive corporate transport market,' and toward that end, began to

work closely with Agusta's engineers to develop the ball bearings for the A–109 [helicopter] with the knowledge that the A–109 was to be marketed throughout the continental United States. Moreover, because the ball bearings are custom-made, [defendant] intended its products to be an inseparable part of the marketing plan of Agusta." *Rockwell*, 553 F. Supp. at 331-32.

As explained above, we agree with this assessment and reach the same conclusion.

¶ 77    Defendant argues that *Rockwell* is no longer valid after *McIntyre* because *McIntyre* endorsed Justice O'Connor's narrow stream-of-commerce theory in *Asahi*, and *McIntyre* therefore requires "some state specific activity on the part of the foreign defendant." Similarly, defendant contends that this court's decision in *Wiles* requires, at a minimum, that defendant be aware that its product was being marketed or sold in Illinois. Defendant claims that it has not engaged in any Illinois-specific activity and had no knowledge that its products were being marketed or sold in Illinois, requiring dismissal under *McIntyre* and *Wiles*.

¶ 78    Initially, as we explained above, we disagree with defendant that *McIntyre* stands for a clear endorsement of Justice O'Connor's narrow stream-of-commerce theory. *Supra* ¶ 70. Moreover, unlike in *McIntyre*, we are not dealing with a single or isolated sale of defendant's products in Illinois. Finally, even if Justice O'Connor's narrow stream-of-commerce theory were applicable here, we believe that plaintiff has presented sufficient evidence to establish that defendant engaged in Illinois-specific activity to establish minimum contacts with Illinois under that more demanding standard.

¶ 79    Specifically, in addition to defendant's relationship with Agusta and its American distributor AAC, the record shows that defendant had a business relationship with a branch or division of Hamilton Sundstrand in Rockford, Illinois. In particular, the record contains hundreds of invoices listing Rockford, Illinois, as the purchasing location for Hamilton Sundstrand, representing multiple shipments of defendant's products that totaled approximately $1 million.

¶ 80    Moreover, Ponchon, who was responsible for selling defendant's products in the United States, made three trips to the Rockford location. As defendant acknowledges in its brief, at least one of the trips was intended to discuss further a product line for the Rockford location, albeit an unsuccessful attempt. Certainly, defendant's business relationship with the Rockford, Illinois, division of Hamilton Sundstrand, including Ponchon's attempts to solicit additional business on behalf of defendant in Illinois, constitutes the additional "purposefully directed conduct" or the "something more" required under Justice O'Connor's narrow stream-of-commerce theory. See *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J.) (adopting the narrow stream-of-commerce theory, and explaining that the "substantial connection" between a defendant and the forum state necessary for minimum contacts "must come about by *an action of the defendant purposefully directed toward the forum State*" (emphasis in original)).

¶ 81    By engaging a business entity located in Illinois, defendant undoubtedly benefitted from Illinois' system of laws, infrastructure, and business climate. See *Burger King Corp.*, 471 U.S. at 475 (explaining that in all cases of specific personal jurisdiction, " 'it is essential in each case that there be some act by which the defendant purposefully avails itself of the

privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws' " (quoting *Hanson*, 357 U.S. at 353)). Indeed, the long-term agreement between defendant and Hamilton Sundstrand indicates that the parties agreed that any disagreements arising from it would be "subject to Illinois law." See *Hyatt International Corp. v. Coco*, 302 F.3d 707, 716 (7th Cir. 2002) (noting that "[w]hile an out-of-state party's contract with an in-state party is not enough alone to establish the requisite minimum contacts [citation], 'prior negotiations and contemplated future consequences, along with terms of the contract and the parties' actual course of dealing' may indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant").

¶ 82    Defendant responds that its connection with Hamilton Sundstrand in Rockford was inconsequential because that location merely processed payments, the products identified in the invoices were all shipped to California, and the Rockford location involved bearings destined for airplane APU's, a completely distinct product line from the helicopter tail-rotor bearings underlying this case. Thus, defendant contends that its relationship with Hamilton Sundstrand in Rockford cannot establish minimum contacts with Illinois because plaintiff's claims here did not "arise from," or "relate to," that relationship. We disagree.

¶ 83    Although the United States Supreme Court has not clarified what is meant by "arising out of" or "related to" in the context of a jurisdiction question (*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 n.10 (1984)), several courts have determined that the applicable standard is lenient or flexible. See, *e.g.*, *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 913 (8th Cir. 2012) (explaining the need for a flexible standard, including the consideration of a totality of the circumstances, when analyzing the "relate to" factor of the Court's standard); *Schneider v. Hardesty*, 669 F.3d 693, 703 (6th Cir. 2012) (noting the "arising from" requirement is subject to a "lenient standard"); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996) (determining that "[i]f a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts"); *Northern Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 25 (1st Cir. 2005) (recognizing that the "arise out of" or "relate to" requirement is a "flexible, relaxed standard"). We believe that the standard has been met here.

¶ 84    Defendant is in the business of manufacturing *custom-made bearings* for the aerospace industry, including bearings for airplanes (Hamilton Sundstrand location in Rockford) and bearings for helicopters (product distributed by Agusta and AAC and involved in the helicopter accident here). In our view, defendant's proposed distinction between subcategories of its primary product, custom-made aerospace bearings, is too restrictive and narrow for purposes of our jurisdictional inquiry. Indeed, at this stage of the inquiry, we must construe all conflicts in the evidence in favor of the plaintiff. See *Wiggen v. Wiggen*, 2011 IL App (2d) 100982, ¶ 20. More importantly, though, defendant cites no authority that would require us to ignore one of its contacts with Illinois based on a categorical distinction within its general product line of custom-made bearings.

¶ 85    Accordingly, we find that defendant has the requisite minimum contacts with Illinois for purposes of specific personal jurisdiction. Defendant is a French manufacturer of custom-made bearings for the aerospace industry. Defendant knowingly used a distributor, Agusta and AAC, to distribute and market its products throughout the world, including the United

-18-

States and Illinois. Defendant's distributor has made multiple sales of its products in Illinois. In addition, defendant has a business relationship with a division of Hamilton Sundstrand in Rockford, Illinois, for defendant's custom-made bearings used in airplanes.

¶ 86                                    B. Reasonableness

¶ 87       Next, having determined that defendant has the requisite "minimum contacts" with Illinois, this court must also consider the reasonableness of requiring the defendant to litigate in Illinois. *Wiles*, 125 Ill. 2d at 152. The factors to consider when deciding reasonableness include: (1) the burden imposed on the defendant by requiring it to litigate in a foreign forum; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in obtaining relief; and (4) the interests of the other affected forums in the efficient judicial resolution of the dispute and advancement of substantive social policies. *Wiles*, 125 Ill. 2d at 152 (citing *Asahi*, 480 U.S. at 113).

¶ 88       Here, Illinois has an indisputable interest in resolving litigation stemming from a fatal Illinois helicopter accident causing plaintiff's death, particularly when plaintiff was living and working in Illinois for an Illinois employer. Aside from Illinois and the foreign forum of France, there does not appear to be any other forum that would have an interest in this controversy. Because the incident occurred in Illinois and involved an individual living and working in Illinois for an Illinois-based employer, Illinois has a substantial interest in this dispute that implicates the societal concerns of products liability and occupational safety. In addition, the underlying accident involved the provision of ambulatory services in Illinois, an issue that undoubtedly is of interest to Illinois and its citizens.

¶ 89       Consequently, we believe that the only relevant factor that weighs against finding jurisdiction reasonable here is the burden imposed on defendant, a French manufacturer, by requiring it to litigate in Illinois. As defendant correctly notes, "[w]here the assertion of personal jurisdiction would force the defendant to defend in a foreign forum under a foreign legal system, significant weight must be given to the burden on the defendant when assessing the reasonableness of 'stretching the long arm of personal jurisdiction over national borders.'" *Morecambe Maritime, Inc. v. National Bank of Greece, S.A.*, 354 Ill. App. 3d 707, 714 (2004) (quoting *Asahi*, 480 U.S. at 114). Indeed, the United States Supreme Court in both *Asahi* and *McIntyre* focused, in part, on the burden imposed on foreign defendants when concluding that the exercise of jurisdiction would be unreasonable. See, *e.g.*, *Asahi*, 480 U.S. at 116 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall and Blackmun, JJ.) (concluding that *Asahi* was one of those "rare cases" when requirements of fairness and justice defeat personal jurisdiction even though the defendant purposefully engaged in forum activities); *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2793-94 (Breyer, J., concurring in the judgment, joined by Alito, J.) (describing the fundamental unfairness of requiring foreign manufacturers "to respond to products-liability tort suits in virtually every State in the United States, even those in respect to which the foreign firm has no connection at all but the sale of a single (allegedly defective) good").

¶ 90       While we afford the burden imposed on defendant substantial weight here, we nonetheless conclude that exercising jurisdiction in Illinois is reasonable. In comparison to

*Asahi*, we are not dealing solely with indemnification claims between Taiwanese and Japanese companies. *Asahi*, 480 U.S. at 106. Instead, the substantive products liability claim asserted by plaintiff against defendant remains before this court.

¶ 91    Furthermore, unlike *McIntyre*, we are not dealing with the single isolated sale by the foreign defendant. *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment, joined by Alito, J.) (determining that "[n]one of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient" for personal jurisdiction). Here, the record demonstrates that multiple sales of defendant's products were made in Illinois over the past 10 years, including business between defendant and the Rockford, Illinois, location of Hamilton Sundstrand.

¶ 92                        III. CONCLUSION

¶ 93    Having carefully analyzed the facts in this case under the applicable standards, we conclude that Illinois' exercise of specific personal jurisdiction over defendant comports with federal and Illinois due process because defendant has the requisite minimum contacts with Illinois and maintaining litigation in Illinois is reasonable. See *Wiles v. Morita Iron Works Co.*, 125 Ill. 2d 144, 150 (1988); *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

¶ 94    Accordingly, we affirm the judgment of the appellate court that reversed the circuit court's dismissal order and remanded for further proceedings.

¶ 95    Appellate court judgment affirmed.

¶ 96    JUSTICE GARMAN, dissenting:

¶ 97    The majority concludes that defendant SNFA had sufficient minimum contacts with Illinois so as to subject it to personal jurisdiction under our case in *Wiles v. Morita Iron Works Co.*, 125 Ill. 2d 144 (1988), and the United States Supreme Court's decisions in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. ___, 131 S. Ct. 2780 (2011) (plurality op.), and *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987). In my opinion, defendant did not, under either *Wiles*, *Asahi*, or *McIntyre*, have sufficient minimum contacts with this state so as to justify Illinois' exercise of personal jurisdiction over defendant. Further, I believe the majority has partially mischaracterized Justice Breyer's concurrence in *McIntyre*. I, therefore, dissent.

¶ 98                        I. *McIntyre*

¶ 99    The United States Supreme Court's *McIntyre* decision, the Court's most recent pronouncement on what constitutes sufficient minimum contacts to invoke personal jurisdiction over a foreign defendant, is central to the outcome in this case. I concur with much of the majority's informed discussion of that case. However, I disagree, to some extent, with the majority's interpretation of Justice Breyer's concurrence.

¶ 100   I agree with the majority that, while the Supreme Court's opinion in *McIntyre* reaffirmed

the continued viability of the stream of commerce theory, the opinion produced no clear, controlling majority analysis for the application of that theory. See *Leading Cases*, 125 Harv. L. Rev. 311, 312 (2011) (noting that the Court could not fashion a majority opinion). I further agree with the majority's statement that Justice Breyer concluded that specific jurisdiction should not be exercised based on a single sale in a forum, even when a manufacturer or producer " 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.' " (Emphasis in original; internal quotation marks omitted.) *Supra* ¶ 65 (quoting *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment, joined by Alito, J.)). This approach is consistent with our holding in *Wiles* "that the competing opinions in *Asahi* required 'at a *minimum*, that the alien defendant is *aware* that the final product is being marketed in the forum State.' " (Emphases in original; internal quotation marks omitted.) *Supra* ¶ 68 (quoting *Wiles*, 125 Ill. 2d at 160).

¶ 101    I take issue, however, with the majority's characterization of Justice Breyer's concurrence as completely rejecting Justice O'Connor's narrower construction of the stream-of-commerce theory in *Asahi*. While Justice Breyer rejected the plurality's "target[ing] the forum" and intention to "submit to the power of a sovereign" language, he nevertheless cited approvingly to Justice O'Connor's requirement of "something more" than simply placing a product into the stream of commerce. *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2792-93 (Breyer, J., concurring in the judgment, joined by Alito, J.). In discussing why the *McIntyre* defendant did not have sufficient minimum contacts, Justice Breyer noted that "the relevant facts found by the New Jersey Supreme Court show no 'regular . . . flow' or 'regular course' of sales in New Jersey; and there is no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else." *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment, joined by Alito, J.). Justice Breyer further found that the plaintiff in *McIntyre* "ha[d] not otherwise shown that the British Manufacturer 'purposefully avail[ed] itself of the privilege of conducting activities' within New Jersey, or that it delivered its goods in the stream of commerce 'with the expectation that they will be purchased' by New Jersey users." *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment, joined by Alito, J.) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980)).

¶ 102    Thus, although Justice Breyer explicitly declined to adopt the "strict" plurality approach, he did seemingly give his endorsement to a "stream of commerce" plus "something more" application of the stream-of-commerce theory. The majority claims that Justice Breyer only "did so to illustrate that dismissal was proper under both the broad and narrow theories of the stream of commerce" (*supra* ¶ 71), but nowhere in Justice Breyer's concurrence does he state that he is only using the "something more" approach as an "illustration." Rather, he appears to use the "something more" approach as part of the "precedents" on which he bases his conclusion that the defendant lacked sufficient minimum contacts with New Jersey. When he wrote that he was relying on the Court's precedents, Justice Breyer did not specifically say which precedents he relied upon and which ones he found invalid. Indeed, one legal source has speculated that Justice Breyer found validity in all three *Asahi* approaches. See Henry S. Noyes, *The Persistent Problem of Purposeful Availment*, 45 Conn.

L. Rev. 41, 75 (2012).[3] Justice Breyer made a point of finding that, when determining the facts found by the New Jersey Supreme Court did not demonstrate sufficient contacts, there was no "something more" and he did not qualify that finding by terming it a mere "illustration." Therefore, while Justice O'Connor's *Asahi* opinion may not have been adopted in full by Justice Breyer, there does, at the very least, appear to be a six-justice majority in *McIntyre* for a "stream of commerce" plus "something more" approach to sufficient minimum contacts.[4]

¶ 103    II. Whether Defendant Had Sufficient Minimum Contacts With Illinois

¶ 104    The majority focuses on two main factors to establish defendant's contacts with Illinois: first on defendant's relationship with Agusta and second on defendant's relationship with Hamilton Sundstrand. The majority finds that defendant's relationship with Agusta was enough to subject defendant to personal jurisdiction in Illinois because Agusta, through AAC, "effectively operated as an American distributor for defendant's tail-rotor bearings in the United States market." *Supra* ¶ 72. The majority further finds that, even if the relationship between defendant and Agusta is not enough to satisfy sufficient minimum contacts, defendant's business dealings with Hamilton Sundstrand concerning airplane ball-bearings showed defendant purposefully availed itself of doing business in Illinois, thus satisfying minimum contacts.

¶ 105    I disagree. I would find that, under the facts of this case, defendant did not have sufficient minimum contacts with Illinois so as to subject defendant to personal jurisdiction in this

---

[3]Professor Noyes writes of Justice Breyer's concurrence: "Justice Breyer seemed inclined to accept each of the three Asahi approaches as a valid way for a plaintiff to establish purposeful availment by an end product manufacturer such as the defendant McIntyre: (1) Justice O'Connor's approach, that is, proof of purposeful targeting of New Jersey customers or 'special state-related design, advertising, advice, marketing, or anything else'; (2) Justice Brennan's approach, that is, proof of a 'regular and anticipated flow of products' to New Jersey for retail sale as part of an established distribution system; and (3) Justice Stevens's approach, that is, proof of a 'regular course of dealing' that involves a certain level of volume, value, or particularly hazardous goods." Noyes, *supra*, at 75.

[4]There are at least two federal district court cases that have found that Justice Breyer's concurrence embraces Justice O'Connor's narrower *Asahi* approach, and thus, along with Justice Kennedy's plurality opinion, currently provides a six justice majority of the Court for Justice O'Connor's approach. See *Smith v. Teledyne Continental Motors, Inc.*, 840 F. Supp. 2d 927, 931 (D.S.C. 2012) ("Thus, six Justices agree that, at a minimum, the limitations of Justice O'Connor's test should be applied, although the plurality would apply an even stricter test, the parameters of which were not precisely defined."); *Northern Insurance Co. of New York v. Construction Navale Bordeaux*, No. 11-60462-CV, 2011 WL 2682950, at *5 (S.D. Fla. July 11, 2011) ("Plaintiff principally relies upon the stream of commerce theory. However, 'something more' than merely placing a product into the stream of commerce is required for personal jurisdiction." (citing *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment, joined by Alito, J.))).

state. The evidence does not show that by doing business with Agusta defendant delivered its goods into the stream of commerce with the expectation that they would be purchased by Illinois users, nor does defendant's relationship with Hamilton Sundstrand show that defendant purposefully availed itself of the privilege of doing business in Illinois so as to justify the exercise of specific personal jurisdiction in this case. See *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment, joined by Alito, J.).

¶ 106                    A. Defendant's Relationship With Agusta

¶ 107    I would find that, concerning the product in question in this case, the helicopter ball-bearings, defendant's relationship with Agusta was insufficient to establish the minimum contacts with Illinois required for personal jurisdiction.

¶ 108    This court in *Wiles* held that "[u]nder either interpretation of the stream of commerce theory, it is clear that purposeful availment of the forum's market requires, at a *minimum*, that the alien defendant is '*aware* that the final product is being marketed in the forum State.'" (Emphases in original.) *Wiles*, 125 Ill. 2d at 160 (quoting *Asahi*, 480 U.S. at 117 ((Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall and Blackmun, JJ.)). Under the broader approach, as long as the defendant is aware the product is being marketed in the forum state, sufficient minimum contacts exist between the defendant and the forum. *Wiles*, 125 Ill. 2d at 157 (citing *Asahi*, 480 U.S. at 117 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall and Blackmun, JJ.)). In contrast, the narrower approach advocated by Justice O'Connor in *Asahi* and adopted, at least in part by Justice Breyer in *McIntyre* as argued above, requires awareness or knowledge on the part of the defendant that the product will be marketed in the forum state along with "something more" or "additional conduct" demonstrating an act purposefully directed toward the forum state. *Wiles*, 125 Ill. 2d at 157 (citing *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J.)).

¶ 109    Similar to our holding in *Wiles*, I would find that defendant's relationship with Agusta, when analyzed under either the O'Connor or Brennan approach in *Asahi* or the Breyer concurrence in *McIntyre*, failed to provide sufficient minimum contacts with Illinois to subject defendant to personal jurisdiction in this state. Despite defendant's relationship with Agusta, there is no evidence in the record that defendant was aware, in any way, that the final product, in this case Agusta's 109C helicopter, was being marketed or sold in Illinois. The record in this case is totally devoid of any evidence that defendant was aware, either during contract negotiations or at the time of delivery of the ball bearings to Agusta in Italy, that Agusta intended to sell any of its products containing the ball bearings to customers in Illinois. See *Wiles*, 125 Ill. 2d at 160 ("The record in this case is totally devoid of any evidence that the defendant was aware either during contract negotiations or at the time of delivery of the products to Astro in Japan that Astro intended to transport two of the air cell formers to Illinois, or that Astro even had a plant in Illinois.").

¶ 110    There is no evidence of specific awareness on defendant's part of marketing or sales in Illinois. The majority holds that sufficient contacts existed because Agusta, through AAC, acted as defendant's "sole distributor" in the United States and that only through that

relationship would defendant's helicopter ball bearings ever reach the final consumer, "including consumers in the United States and Illinois." The majority finds that, because Agusta " 'is the marketer and distributor to the consumer of their joint and ultimate product,' " defendant " 'has chosen to leave to Agusta the marketing and distribution to the consumer' " and thus " 'Agusta is thus the conduit through which [defendant's] product, custom-made for Agusta, reaches the ultimate consumers.' " *Supra* ¶ 74 (quoting *Russell v. SNFA*, 2011 IL App (1st) 093012-B, ¶ 41). The majority cites to five Agusta helicopters sold in Illinois in the last 10 years and 2,198 defendant-manufactured parts sold by Agusta to entities in Illinois between 2000 and 2007.[5] However, the majority cites to no evidence that shows defendant knew or was aware that Agusta was selling or marketing its products specifically in Illinois. Frederic Ponchon, defendant's sales representative in the United States, testified at his March 10, 2009, deposition that he was only concerned with defendant's sales to Agusta in Italy, and did not concern himself with Agusta/AAC's sale or distribution of defendant's bearings or helicopters containing defendant's bearings in the United States. When asked specifically if he had "any understanding as to whether Agusta helicopters which contain SNFA bearings [were] sold within Illinois in the 2003 to 2005 time frame," Ponchon answered "no." In an affidavit dated February 26, 2008, Ponchon averred that "[p]rior to the commencement of the litigation, SNFA had no information as to know that any A109 series helicopter could have been sold to entities in Illinois" and that "SNFA had no knowledge that its products could be destined for Illinois." In its March 16, 2007, response to interrogatories, AAC stated "it has had no meetings or communications with SNFA regarding the sale or marketing of SNFA products in the United States." In its October 30, 2006, response to interrogatories, Agusta stated that "it held no meetings and has had no communications with SNFA regarding the sale and marketing of SNFA products in the United States."

¶ 111     Thus, the majority fails to show that defendant was aware its products, in Agusta's finished product, were being marketed or sold to consumers in Illinois. To subject defendant to jurisdiction for a products liability action because it "knows or reasonably should know" that its ball bearings are being distributed through AAC's nationwide distribution system in a way that *might* lead to those products being sold in any of the 50 states, without requiring a finding that defendant was specifically aware that Agusta, through AAC, was selling its

---

[5]There appears to be some confusion in the record and the briefs as to whether the 2,198 SNFA parts were sold to *Illinois* customers specifically, or *United States* customers as a whole. As noted in the majority opinion (*supra* ¶ 12), the interrogatory to AAC asked specifically about AAC's distribution or sales of defendant's product in Illinois "in the last 10 years." AAC responded that it "has sold approximately 2,198 SNFA-produced parts since 2000," without specifying whether those parts were sold in Illinois or the United States as a whole. In fact, plaintiff's brief takes AAC's response to mean that "[i]n the past 10 years, Agusta has distributed 2198 SNFA bearings units in the United States." During the March 10, 2009, deposition of Frederic Ponchon, plaintiff's attorney Brian LaCien asked Ponchon "[a]re you aware that Agusta has distributed more than 2,000 bearings in the United States in the time period of 1995 to 2005?" to which Ponchon responded, "I'm just finding out now."

products in Illinois, "would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between 'the defendant, the *forum*, and the litigation,' it is fair, in light of the defendant's contacts *with that forum*, to subject the defendant to suit there." (Emphases in original.) See *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment, joined by Alito, J.) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). The defendant must be aware its distributor is marketing or selling the finished product (containing the defendant's product) in the forum state to subject the defendant to personal jurisdiction in that state. The majority's holding would subject defendant to jurisdiction in *any* state in which Agusta sold helicopters containing defendant's products, whether or not defendant was actually *aware* its products were being marketed or sold in such a state, thereby essentially causing defendant's "amenability to suit [to] 'travel[ ] with the chattel,' " something specifically forbidden by our Supreme Court. *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment, joined by Alito, J.) (quoting *World-Wide Volkswagen*, 444 U.S. at 296).[6]

¶ 112    I would also note that, like the defendant manufacturer in *Asahi* but unlike the defendant manufacturers in *McIntyre* or *Wiles*, defendant's ball bearings are merely a component part of the larger finished product manufactured by Agusta and distributed in the United States by AAC. See *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2786 (metal-shearing machine at issue manufactured by McIntyre in United Kingdom and was sold to a consumer in the United States by an independent company); *Asahi*, 480 U.S. at 106 (Asahi manufactured valve assembly of a tire produced by Cheng Shin on a Honda motorcycle that crashed in California); *Wiles*, 125 Ill. 2d at 147 (United States company Astro purchased four "air cell former" machines manufactured by the defendant Japanese company and distributed the machines to Astro plants in the United States, including Illinois). While the distinction between a component part manufacturer defendant and a finished product manufacturer defendant in a distributor/stream-of-commerce analysis is not fully articulated in our case law, at least one legal scholar has theorized that the two types of manufacturers should be treated differently. See Henry S. Noyes, *The Persistent Problem of Purposeful Availment*, 45 Conn. L. Rev. 41, 87-88 (2012).

---

[6]I am not arguing that defendant escapes personal jurisdiction simply because it did not directly sell helicopter ball bearings to Illinois customers or because Agusta acted as a "distributor" for defendant's products. Certainly, even under the narrow approach, a defendant manufacturer could be subject to personal jurisdiction in a state if it created, controlled, or employed the distribution system that brought its product to the forum state. *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J.). Under the broad approach, a defendant manufacturer's regular and extensive sales of component parts to a manufacturer/distributor it knew was making regular sales of the final product in the forum state is sufficient to establish minimum contacts. *Asahi*, 480 U.S. at 121 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall and Blackmun, JJ.). Here, there is no evidence that defendant "created, controlled, or employed" Agusta's distribution system that brought the helicopter ball bearings in the 109C to Illinois, nor is there any evidence that defendant knew or was aware of Agusta's sale or marketing of helicopters containing defendant's ball bearings in Illinois.

¶ 113    Professor Noyes distinguishes a component part manufacturer from a finished product manufacturer "[b]ased on the limited ability of a component part manufacturer to control the location of the initial sale of the end product." Noyes, *supra*, at 87. In contrast, an end product manufacturer "retain[s] nearly complete control over the location of the initial sale of [its] product[ ]." Noyes, *supra*, at 92. Therefore, "it is not reasonably feasible for a component part manufacturer to sever its connection with a particular state" and, thus by way of example, "absent some additional conduct on the part of a New York component part manufacturer, there is no purposeful availment of Oklahoma when its product is incorporated in an end product that is later sold in Oklahoma and causes injury there." Noyes, *supra*, at 87-88. Component parts that are very popular because of high quality are generally incorporated into end products manufactured by numerous end product manufacturers and "will inevitably wind up in the hands of consumers in most or all fifty states." Noyes, *supra*, at 99. Professor Noyes does not find this to be purposeful availment because "the component part manufacturer cannot 'structure [its] primary conduct' so as to avoid purposeful availment and to forestall being subjected to a lawsuit in a disfavored forum." Noyes, *supra*, at 99 (quoting *World-Wide Volkswagen*, 444 U.S. at 297). Professor Noyes reads *Asahi*, in the opinions of Justices O'Connor and Stevens, as requiring "some additional facts to support a finding of purposeful availment" when it comes to a component part manufacturer. Noyes, *supra*, at 88. He favored the O'Connor approach over the Stevens approach because, while the Stevens approach concerned conduct not in the control of the component manufacturer (regular course of dealing, high volume of sales, hazardous goods), the O'Connor approach required additional conduct that was in the control of the component manufacturer, such as advertising in the state, providing customer service in the state, or designing the product for the state. Noyes, *supra*, at 88. Professor Noyes concluded that "absent proof of additional conduct by a defendant targeting the forum state, a component part manufacturer has not purposefully availed itself of the forum state based on injuries caused by the component product in the forum state even where a high volume of the component product ends up in the forum state." Noyes, *supra*, at 91.[7] Therefore, while recognizing that the component/finished product distinction has not been a key factor in our minimum-contacts analysis, I would nevertheless find defendant's status as a component part manufacturer weighs against finding sufficient minimum contacts with Illinois under the facts of this case.

¶ 114    In sum, I would find that defendant's sale of its helicopter ball bearings to Agusta, which then incorporated those ball bearings into finished helicopters that were shipped to Agusta's customers in Europe and the United States, did not establish sufficient minimum contacts to subject defendant to personal jurisdiction in Illinois.

---

[7]This does not mean that an injured consumer is without recourse. If the forum state lacks jurisdiction over the component part manufacturer, the injured consumer can seek relief from the end product manufacturer and distributor, as they control the location of the initial sale and are in the best position to refuse or continue to sell the end product in the forum state. Noyes, *supra*, at 91.

¶ 115                  B. Defendant's Relationship With Hamilton Sundstrand

¶ 116      The majority concludes that, standing alone, defendant's relationship with Agusta is enough to constitute sufficient minimum contacts. However, responding to defendant's argument that it has not engaged in any Illinois-specific activity and had no knowledge that its products were being marketed or sold in Illinois, the majority holds that, even if it were to apply the more narrow approach of Justice O'Connor, it would find "that plaintiff has presented sufficient evidence to establish that defendant engaged in Illinois-specific activity to establish minimum contacts with Illinois" based on defendant's relationship with Hamilton Sundstrand. *Supra* ¶ 78. I disagree.

¶ 117      In *Asahi*, Justice O'Connor wrote that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J.). Such additional conduct that could indicate an intent or purpose to serve the market in the forum state could include "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J.). Justice Breyer echoed this language in his *McIntyre* concurrence, suggesting "something more" constituted "special state-related design, advertising, advice, marketing, or anything else" such as a "specific effort by the [defendant] to sell in [the forum state]" or a "list of potential [forum state] customers who might, for example, have regularly attended trade shows." *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment, joined by Alito, J.).

¶ 118      Here, the majority cites to several aspects of defendant's relationship with Hamilton Sundstrand to establish "something more": hundreds of invoices listing Rockford, Illinois, as the purchasing location for Hamilton Sundstrand representing multiple shipments of defendant's products that totaled $1 million; the long-term agreement between defendant and Hamilton Sundstrand "indicate[d] that the parties agreed that any disagreements arising from it would be 'subject to Illinois law' "; and Ponchon's three trips to Rockford, at least one of which was an unsuccessful trip intended to "discuss further a product line for the Rockford location." *Supra* ¶¶ 79-81.

¶ 119      I disagree with the majority's findings. It should be noted that the ball bearings in question involving Hamilton Sundstrand were "aerospace" ball bearings for use in airplanes and fixed-winged aircraft. These bearings were sold directly to customers in the United States, such as Hamilton Sundstrand, Rolls Royce, and Honeywell. These are not the same types of bearings, helicopter bearings, that were sold to Agusta and that were in the helicopter that crashed and gave rise to the instant litigation.

¶ 120      None of these cited examples of contacts between defendant and Hamilton Sundstrand satisfy the "something more" required by Justice O'Connor. First, all of the invoices cited by the majority list the delivery address as "Sundstrand Power Systems" in San Diego. No product of defendant's was ever actually delivered *to* Illinois. The "Firm Name" is listed as Hamilton Sundstrand in Rockford, care of the "Acc. Payable" department. In an affidavit dated November 12, 2007, Ponchon averred that defendant commenced its business

relationship with Sundstrand in San Diego in 1997, selling Sundstrand aerospace bearings. Then, in 1999, Sundstrand was taken over by Connecticut-based UTC and at that point became "Hamilton Sundstrand." Hamilton Sundstrand subsequently centralized its invoice handling procedure for all invoices addressed to Hamilton Sundstrand for orders and deliveries at its Rockford location. As of the date of the affidavit, however, defendant still supplied Hamilton Sundstrand in San Diego with bearings and "ha[d] never provided bearings to Hamilton Sundstrand in Illinois." Similar averments are made in the January 16, 2007, affidavit of defendant's managing director Julian Vahanian. In his July 19, 2007, deposition, Ponchon testified that the Rockford facility of Hamilton Sundstrand made electric generators and actuators for which defendant did not ship bearings and it was his understanding that defendant's products were not used or utilized at the Rockford facility. Ponchon testified that defendant only actually sold bearings to the San Diego division. Further, the bearings were only shipped to San Diego and, when conducting purchases, defendant only communicated and interacted with Hamilton Sundstrand representatives in San Diego.

¶ 121    Next, the long-term agreement does not satisfy the "something more requirement." While the agreement dated February 4, 2004, does list the "buying location" as Rockford, the agreement itself states that Hamilton Sundstrand is a Delaware corporation "having headquarter offices located at One Hamilton Road, Windsor Locks, Connecticut," and that, unless otherwise expressly agreed to in writing, the agreement "shall be interpreted in accordance with the plain English meaning of its terms and the laws of the State of Connecticut."[8] Further, all alternative dispute resolution proceedings "shall take place in Connecticut." The destination was listed as the "Buyer's Facility." However, as already noted, there is no evidence that any of defendant's product was ever, in any transaction, shipped to Illinois. Rather, based on the invoices, "Buyer's Facility" appears to be San Diego. Ponchon testified that, when it came to negotiating and ordering new purchases of defendant's products, he only spoke with San Diego-based Hamilton Sundstrand employees. At his July 17, 2007, deposition, when questioned by plaintiff's attorney as to what he understood by the term "buying location," Ponchon responded that in his mind the buying was done from San Diego, and that the Rockford contact simply granted and prepared the contract due to UTC's organizational structure for completing business transactions. Rockford may have been listed as the "buying location" on the long-term agreement, but for all intents and purposes defendant was interacting with San Diego.

¶ 122    Finally, with regard to Ponchon's 2000 and 2003 visits to Rockford, neither visit actually resulted in any of defendant's products being sold to Illinois customers. Ponchon testified that the 2000 visit was not to sell bearings to Rockford, but to visit a "prospective client" in the wake of Sundstrand's takeover by UTC and "[t]o give the people within the Hamilton Sundstrand organization who were responsible for bearings an opportunity to know who we, at SNFA, are." However, even if the 2000 visit is characterized as a sales attempt, it

_____

[8]The majority states the long-term agreement is subject to the laws of Illinois, but I believe they are referring to a proprietary information agreement entered into between defendant and Hamilton Sundstrand, not the long-term parts purchasing agreement.

constitutes one incident from which no sales actually resulted. In the November 12, 2007, affidavit, Ponchon characterized the 2003 Rockford visit as concerning the long-term agreement and the new payment arrangement for purchases from Hamilton Sunstrand in San Diego. Ponchon averred that "[t]he topic of our discussions exclusively concerned the sales of bearings to the Hamilton Sundstrand plant in San Diego." I would not find these visits qualified as "something more."

¶ 123    In sum, the record is devoid of evidence that the aerospace bearings sold to Hamilton Sundstrand in San Diego were meant to be sold to Illinois consumers. Thus, there is no evidence that defendant specifically designed its product for market in Illinois, advertised in Illinois, or established channels for providing regular advice for customers *in* Illinois. See *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J.). Besides possibly the 2000 visit, there does not appear to be an effort by defendant to sell *in* the forum state, nor is there a list of defendant's potential customers in Illinois. See *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment, joined by Alito, J.). Justice Breyer found that one actual sale in the forum, even when the defendant is aware the product will be sold there, is not enough to establish sufficient minimum contacts, let alone one unsuccessful direct sales attempt of a different product than the one giving rise to the instant litigation. See *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2793-94 (Breyer, J., concurring in the judgment, joined by Alito, J.). I would find that defendant's relationship with Hamilton Sundstrand did not satisfy the "something more" to establish sufficient minimum contacts under *Asahi* or *McIntyre*, as any contact with Illinois was incidental and too tenuous to justify subjecting defendant to personal jurisdiction in this state.

¶ 124                                    III. Conclusion

¶ 125    The helicopter in question, from which this litigation arose, was built by Agusta in Italy. Defendant, a French company, sold Agusta the ball bearings that Agusta incorporated into the helicopter's tail rotor. Agusta then sold the finished helicopter in 1989. Between 1989 and 1998, the helicopter was owned by multiple entities and operators, before being sold by a German company to Metro Aviation in Louisiana. Finally, in 2002 Metro sold the helicopter to Air Angels, an Illinois company. The helicopter crashed in Illinois in 2003. Defendant, at no point, purposefully availed itself of Illinois as it relates to the helicopter in question. AAC, Agusta's stateside subsidiary, sells defendant's products in Illinois, but the helicopter in question was not even sold to the Illinois consumer by AAC, but rather by Metro. There is no dispute that, when it comes to the crashed helicopter, defendant's contacts with Illinois are essentially nonexistent. However, as detailed above, I also find the record to be absent of any evidence that defendant itself was aware any of its helicopter rotor bearings were being marketed or sold by Agusta, though AAC, in Illinois. Further, there is no evidence that, concerning defendant's relationship with Hamilton Sundstrand, defendant ever sold any product to any Illinois consumer. Under the majority holding, a foreign defendant can now be haled into court in Illinois for even the most fleeting and inconsequential business contact with this state. Indeed, defendant is now subject to Illinois jurisdiction even though it has never actually sold a single item to an Illinois consumer. I believe that for the majority to conclude that such facts subject a foreign defendant to

personal jurisdiction in Illinois stretches our definition of "sufficient minimum contacts" beyond the limits set by the United States Supreme Court and our own precedent in *Wiles*. The plaintiff bears the burden of establishing jurisdiction. See *McIntyre*, 564 U.S. at ___, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment, joined by Alito, J.); *supra* ¶ 28. I would find plaintiff has not met that burden in this case. Therefore, I respectfully dissent.