2021 IL App (1st) 210032

SIXTH DIVISION
December 3, 2021

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-21-0032

| | | |
|---|---|---|
| PATTIE A. HARDING, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | |
| CORDIS CORPORATION, a Florida Corporation; | ) | |
| JOHNSON & JOHNSON, a New Jersey Corporation; | ) | No. 17 L 8306 |
| CONFLUENT MEDICAL TECHNOLOGIES, INC., a | ) | |
| Delaware Corporation; and GAIL SUSAN SMITH, M.D., | ) | |
| | ) | |
| Defendants, | ) | The Honorable |
| | ) | Gerald Cleary, |
| (Confluent Medical Technologies, Inc., Defendant- | ) | Judge Presiding. |
| Appellant). | ) | |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    The question before us is whether a defendant who manufactures a custom component of a medical device that is alleged to have caused injury to an Illinois resident has sufficient minimum contacts with this state to subject itself to the jurisdiction of our courts. This defendant knew the medical device was sold in the United States but not which specific states it was sold in. The defendant also sold other similar products directly to Illinois. We hold that our courts do have jurisdiction over this defendant for the reasons outlined in this opinion.

¶ 2    The plaintiff, Pattie A. Harding, brought a suit against several defendants, including Confluent Medical Technologies, Inc. (Confluent), after suffering injuries due to what she alleged was a defective medical device manufactured, sold, and implanted by the defendants. Confluent moved, unsuccessfully, to dismiss the claims against it for a lack of personal jurisdiction. Confluent now appeals, arguing that it lacks the requisite minimum contacts with Illinois for the State to exercise personal jurisdiction over it. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Ms. Harding alleged in her complaint that in June 2010 she suffered personal injuries as a direct and proximate result of a defective inferior vena cava (IVC) filter. According to the complaint, an IVC filter is a medical device "designed to filter or 'catch' blood clots that travel from the extremities to the heart and lungs." Computerized tomography scans performed in December 2015 and February 2016 revealed that "tines" of the IVC filter had perforated the wall of Ms. Harding's inferior vena cava, that the filter had migrated and fractured, and that a piece of the filter was lodged in Ms. Harding's heart.

¶ 5    Ms. Harding alleged that Confluent was incorporated in Delaware and headquartered in California. She further alleged that Confluent was an affiliate of Cordis Corporation (Cordis) and was involved in the manufacture and design of the IVC filters. Ms. Harding alleged that "Confluent ha[d] conducted business and derived substantial revenue from within the State of Illinois, from including, but not limited to, its business activities related to [the] IVC filters."

¶ 6    Ms. Harding also alleged that Confluent and Cordis:

"were engaged in the business of researching, developing, designing, setting specifications for, licensing, manufacturing, preparing, compounding, assembling, processing, selling, distributing, marketing, and/or introducing into interstate commerce and into the State of

Illinois, either directly or indirectly through third parties or related entities, the Cordis IVC filters—specifically, the OptEase filter—to be implanted in patients throughout the United States, including Illinois, and including the Cordis IVC filters implanted in [Ms. Harding], and derived substantial income from doing business in Illinois."

¶ 7    Ms. Harding also states in her brief that "[t]he OptEase IVC filter medical device was comprised of the nitinol filter manufactured by Confluent, the delivery system, instructions for use, and other labeling materials," suggesting that the nitinol filter custom manufactured by Confluent for Cordis was the significant component of Cordis's OptEase filter. Confluent did not refute this characterization of its product.

¶ 8    Ms. Harding's claims against Confluent and Cordis included strict products liability based on a product defect, an inadequate warning, and a manufacturing defect; negligence; negligent misrepresentation; fraudulent misrepresentation; fraudulent concealment; and breaches of both express warranty and implied warranty of merchantability. She asked for general noneconomic damages for past and future pain and suffering, emotional distress, and loss of enjoyment of life, plus special economic damages for past and future medical expenses, disgorgement of profits, restitution, statutory damages, costs, and pre- and post-judgment interest.

¶ 9    Confluent moved to dismiss Ms. Harding's complaint under sections 2-301 and 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-301, 2-619 (West 2018)). It argued that Ms. Harding had failed to allege any facts that would allow the circuit court to exercise personal jurisdiction over it. Confluent stated that it "did not design, manufacture, market, sell or distribute any portion of the OptEase IVC filter at issue in this case in Illinois" and that Ms. Harding therefore could not show that Confluent "purposefully directed its activities at Illinois" or that the claims against Confluent "arose out of or relate[d] to Confluent's contacts with Illinois."

¶ 10     Confluent explained that, although it did manufacture nitinol component parts used in Cordis's OptEase filter, "using the manufacturing processes from Cordis and based on the design and specifications from Cordis," it did so in California until 2010 and thereafter in Costa Rica. According to Confluent, it "sells the component parts directly to Cordis and ships them to Juarez, Mexico." Confluent maintained that it did not sell, distribute, or manufacture nitinol components for IVC filters in Illinois; it did not know where Cordis marketed or sold its IVC filters; it maintained no offices, agencies, places of business, post office boxes, or telephone listings in Illinois; it did not have any interest in any property in Illinois; it did not pay taxes or have employees or agents who resided in Illinois; and it did not engage in the direct solicitation of business or directly advertise any goods or services in Illinois. Confluent acknowledged that it did "sell a very small amount of its products in Illinois" but insisted both that "none of th[o]se products [were] related to the IVC filters at issue in this litigation" and that sales of those products in Illinois represented only a *de minimis* amount (less than 0.05%) of its total sales.

¶ 11     Confluent attached to its motion the affidavit of its plant controller Jorge Kau, who attested to all of the above factual information. The only discrepancy between the facts as presented in Confluent's motion and Mr. Kau's affidavit was that Mr. Kau said that Confluent's nitinol-product sales in Illinois made up 0.5% of its total sales, rather than 0.05%.

¶ 12     During a September 24, 2019, hearing in the circuit court, the parties discussed Confluent's proposed stipulation that, during the time Confluent had manufactured the nitinol component for use in Cordis's OptEase filters, it "was generally aware that Cordis was selling the IVC filters in the United States" but "was not aware of the specific states into which Cordis sold its IVC filters, including whether Cordis sold its IVC filters in Illinois." At oral argument in this court there appeared to be some dispute about whether this had formally been stipulated to. Having reviewed

the complete transcript of the hearing, it appears to us that Ms. Harding's counsel in fact agreed to this statement. The stipulation further stated that Confluent manufactured its component parts in California and shipped them to Juarez and that, "[f]rom there, any decision on the ultimate destination of the IVC filters was Cordis'[s]." The parties agreed that Confluent had "never had control over the ultimate destinations of the IVC filters."

¶ 13    In her response to the motion to dismiss, Ms. Harding insisted that she had established a *prima facie* basis for the court to exercise jurisdiction over Confluent. Ms. Harding relied on the following specific facts: (1) her OptEase filter was implanted in an Illinois hospital, (2) the filter incorporated a component part that was manufactured by Confluent, (3) though Confluent did not specifically know that Cordis sold IVC filters in Illinois, it did know that Cordis sold them generally in the United States, and (4) throughout the time relevant to her cause of action, Confluent "systematically and consistently engaged in the business of selling nitinol products to companies located in Illinois." In support of her motion, Ms. Harding attached portions of her medical records.

¶ 14    Ms. Harding also attached interrogatory responses from Confluent stating that its gross sales of raw nitinol materials and nitinol components shipped to Illinois were $415,146 in 2009; $469,531 in 2010; $276,658 in 2011; $61,261 in 2012; $143,735 in 2013; $263,510 in 2014; $132,606 in 2015; $226,047 in 2016, and $101,109 in 2018. Confluent also explained that it did not know how all of its Illinois customers used the nitinol once it was shipped, so it could not say exactly what percentage was used for medical devices. Confluent was aware, however, that at least two of its Illinois customers used Confluent's raw nitinol materials or nitinol components for medical devices and that "[s]ales to those customers accounted for approximately 59% of Confluent's gross sales of raw nitinol materials and/or nitinol components shipped to Illinois

between 2011 and 2017."

¶ 15    In support of its motion to dismiss, Confluent attached two affidavits of Tom Duerig, its founder and chief technology officer. In the first affidavit, Mr. Duerig stated that, in March 2009, Confluent, which was then called NDCI, agreed to supply Cordis with the nitinol components for its IVC filters. According to Mr. Duerig, Confluent was bound by Cordis's specifications for the component parts for the IVC filters. Mr. Duerig also attested that he never received "any information as to where the IVC filters were sold, including whether they were sold in Illinois."

¶ 16    In the second affidavit, Mr. Duerig stated that he served on Cordis's management board for a time while he was employed there but "d[id] not recall being informed or made aware of the particular states or countries in which the Cordis IVC filters were sold, although [he] was generally aware that the Cordis IVC filters were sold in the United States and Europe." Mr. Duerig further maintained that at the present time, in his role as president of Confluent, he still did not "specifically know where the Cordis IVC filters [were] ultimately marketed, distributed, or sold."

¶ 17    The circuit court denied Confluent's motion to dismiss. In its written order, the court largely relied on our supreme court's decision in *Russell v. SNFA*, 2013 IL 113909. Comparing the business relationship in *Russell* to the one between Confluent and Cordis, the circuit court found that Cordis acted as a distributor for the nitinol components manufactured by Confluent. The court also found that Confluent benefited from the "laws, infrastructure, and business climate" of Illinois because, in addition to manufacturing nitinol component parts for Cordis, Confluent also "sold nitinol products to Illinois customers that amounted to 59% of its gross sales of nitinol products between 2011 and 2017."

¶ 18    The circuit court found that "Confluent purposefully directed its activities at the State of Illinois and the cause of action arose out of or relates to Confluent's contacts with the state of

Illinois." The circuit court concluded that Cordis was the distributor for Confluent, Confluent knew its products were being sold in Illinois, and it was reasonable to require Confluent to defend itself in Illinois.

¶ 19                                    II. JURISDICTION

¶ 20     The circuit court denied Confluent's motion to dismiss on December 14, 2020, and Confluent timely filed a petition for leave to appeal to this court on January 13, 2021. We granted that petition on February 24, 2021. Accordingly, we have jurisdiction pursuant to Illinois Supreme Court Rule 306(a)(3) (eff. Oct. 1, 2020), governing permissive appeals from the circuit court's denial of a motion to dismiss on grounds that the circuit court lacks personal jurisdiction.

¶ 21                                    III. ANALYSIS

¶ 22     Section 2-209 of the Code, also referred to as the Illinois long-arm statute, enumerates certain acts that will allow Illinois courts to exercise personal jurisdiction over a nonresident defendant. 735 ILCS 5/2-209 (West 2020). As relevant here, subsection (c) of the statute also permits the exercise of personal jurisdiction over a nonresident defendant "on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." *Id.* § 2-209(c). "When subsection (c) is invoked, we assess whether the nonresident defendant['s] contacts with Illinois suffice to satisfy both federal and Illinois due process." *Rios v. Bayer Corp.*, 2020 IL 125020, ¶ 17. Confluent does not argue that the Illinois Constitution requires any greater restraints on the exercise of jurisdiction than the federal constitution, so we need only consider federal constitutional principles. *Id.*

¶ 23     Ms. Harding, as the plaintiff, had the burden to "establish a *prima facie* basis for exercising personal jurisdiction over a nonresident defendant." *Id.* ¶ 16. "A plaintiff's *prima facie* case may be rebutted where a defendant presents uncontradicted evidence that defeats jurisdiction." *Sabados*

*v. Planned Parenthood of Greater Indiana*, 378 Ill. App. 3d 243, 246 (2007). Where, as here, the circuit court found that the plaintiff met that burden "solely based upon documentary evidence, review is conducted *de novo*." *Id.* And in this case, we find that Ms. Harding established that Confluent had sufficient minimum contacts to allow Illinois to exercise personal jurisdiction over it and that Confluent has failed to present any uncontradicted evidence rebutting that conclusion.

¶ 24                                    A. Minimum Contacts

¶ 25    The threshold issue in a personal jurisdiction challenge in Illinois is "the 'minimum contacts' test." *Russell*, 2013 IL 113909, ¶ 36. The contacts necessary to satisfy this test will depend on whether general or specific personal jurisdiction is being asserted. *Id.* General jurisdiction exists where a corporate defendant "has engaged in continuous and substantial business activity within the forum." *Id.* Specific jurisdiction, which is what Ms. Harding has alleged exists here, requires a showing that (1) "the defendant purposefully directed its activities at the forum state" and (2) "the cause of action arose out of or relates to the defendant's contacts with the forum state." *Id.* ¶ 40.

¶ 26    One avenue to specific jurisdiction is the "stream-of-commerce theory," first recognized by the United States Supreme Court in *World-Wide Volkswagen Corp. v. Woodsen*, 444 U.S. 286 (1980). In that case, the Supreme Court held that "[a] forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 297-98. The parties agree that the relevant inquiry in this case is whether the stream-of-commerce theory applies.

¶ 27    Our supreme court in *Russell*, after tracing the history of this theory in the United States Supreme Court, offered the following three observations: (1) the United States Supreme Court

"unanimously endorsed the continued validity of the stream-of-commerce theory from *World-Wide Volkswagen* to establish specific personal jurisdiction," but did not settle precisely how that theory would be applied; (2) according to a "clear majority of the Court," "specific jurisdiction should *not* be exercised based on a single sale in a forum, even when a manufacturer or producer 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold' " in the forum state; and (3) only a minority of the United States Supreme Court "believes that a broader stream-of-commerce theory should be applied to adapt to modern globalized commerce." (Emphases in original.) *Russell*, 2013 IL 113909, ¶¶ 67-69.

¶ 28    With these concepts in mind, our supreme court in *Russell* found that Illinois courts had personal jurisdiction over a nonresident defendant based on the stream-of-commerce theory. The facts present in *Russell*, which are very similar to the facts in this case, demonstrated to our supreme court, to an extent sufficient to satisfy any due process concerns, that the defendant purposefully directed its activities to Illinois and the plaintiff's claim arose out of those activities.

¶ 29    SNFA, the nonresident defendant in *Russell*, was a French corporation that custom manufactured bearings for the aerospace industry and tail-rotor bearings for helicopters made by the Italian manufacturer, Agusta. Those helicopters were then distributed internationally by Agusta's American subsidiary, AAC. *Id.* ¶¶ 10-12. The evidence in that case showed that the nonresident defendant did *not* have specific direct knowledge that the finished products were being sold in Illinois. *Id.* ¶¶ 13, 19. Our supreme court nevertheless found that the defendant had purposefully availed itself of the privileges of conducting activities in Illinois and thereby directed its activities to this state. *Id.* ¶ 80.

¶ 30    The court first determined that Agusta and AAC "effectively operated as an American

distributor" for SNFA's custom bearings. *Id.* ¶ 72. SNFA custom manufactured bearings specifically for Agusta, which were then incorporated into helicopters that were sold internationally. Our supreme court emphasized that "the *sole* market for [the] defendant's bearings of this type would be Agusta or an owner of an Agusta helicopter that needed to replace those bearings" and "the *only* way that [the] defendant's product \*\*\* would ever reach the final consumer, including consumers in the United States and Illinois, was through Agusta and its American distributor AAC." (Emphases in original.) *Id.* ¶ 73.

¶ 31 In addition to selling custom-made helicopter tail bearings to Agusta, SNFA manufactured and sold different bearings for airplanes and fixed-wing aircraft to several other companies, including Hamilton Sundstrand, it maintained a business relationship with that company in Rockford, Illinois, and one of its employees had made three trips to the Rockford location, at least one of which was an attempt to solicit more business. *Id.* ¶¶ 14-15, 80. This was, our supreme court found, "additional 'purposefully directed conduct' " or the " 'something more' " required under even a narrow reading of the stream-of-commerce theory. *Id.* ¶ 80.

¶ 32 Our supreme court also found that this additional, purposefully directed conduct was sufficiently related to the plaintiff's claim in *Russell*, such that it should be considered part of the defendant's necessary minimum contacts with the state. As the *Russell* court noted, "several courts ha[d] determined that the applicable standard" for whether a plaintiff's claims arise from or relate to the defendant's contacts with the forum "is lenient or flexible." *Id.* ¶ 83. The court thus rejected SNFA's "proposed distinction between subcategories of its primary product, custom-made aerospace bearings" as "too restrictive and narrow." *Id.* ¶ 84. Instead, the court considered the totality of the contacts with Illinois that were related to SNFA's "general product line of custom-made bearings." *Id.*

¶ 33    As noted above, in our view, the jurisdictional issue here is very similar to the one before our supreme court in *Russell*. As in *Russell*, Confluent has what is effectively a distributor relationship with Cordis. Confluent custom manufactures the nitinol component parts for the IVC filter at issue *specifically* for Cordis, based on a design and specifications supplied by Cordis. Cordis, in turn, incorporates Confluent's component parts into the OptEase filter. Confluent knew that the OptEase filters would be sold throughout the United States. The *sole* market for Confluent's nitinol components for the OptEase filters was through Cordis's nationwide sales and the *only* way Confluent's custom-made nitinol components for the OptEase filters would ever reach the final consumer in Illinois, or anywhere else, was through Cordis.

¶ 34    Confluent argues that this case is different than *Russell* and that there is no distributor relationship because it only sold component parts to Cordis, whereas the defendant in *Russell* also sold replacement parts, through the helicopter manufacturer, to the customers who had purchased helicopters. We agree with Ms. Harding that this is not a meaningful distinction. As in *Russell*, Confluent made a custom-designed component part that was an integral and inseparable part of a finished product that could only reach the consumers through another company—here Cordis—and that meant that Cordis was in effect a distributor for Confluent in terms of placing its product into the stream of commerce.

¶ 35    We reject Confluent's hyperbolic concern that calling Cordis a distributor means that "any manufacturer would become the distributor for any number of component part suppliers." There is an important distinction, one that the circuit court recognized here and that our supreme court recognized in *Russell*, between the sale of standardized component parts having many useful applications, such as ordinary nuts and bolts, and the purposeful availment by the manufacturer of a highly specialized component part of a distributor's exclusive network of nationwide marketing

and sales. Here, Confluent manufactured a nitinol filter that could *only* enter the stream of commerce through the marketing efforts of Cordis.

¶ 36 And here there was also the "additional 'purposefully directed conduct' " by Confluent or the "something more" that the *Russell* court highlighted in its analysis—namely, Confluent's direct Illinois sales of raw nitinol and nitinol components and, in particular, the portion of those sales that were used for other medical devices.

¶ 37 Confluent emphasizes the fact that the circuit court in this case misstated the facts when it said that Confluent "sold nitinol products to Illinois customers that amounted to 59% of its gross sales of nitinol products between 2011 and 2017." In fact, the evidence in the record was that 59% represented the percentage of Illinois sales to the two customers who were known by Confluent to use the nitinol products for medical devices. Thus, as Confluent points out in its brief, the 59% was "a *subset* of the 'less than 0.5%'of Confluent sales in Illinois.' " (Emphasis in original.) However, Confluent does not dispute that this 0.5% totaled over $2 million in sales between 2011 and 2017. Thus, even with the miscalculation, it is clear there were a significant number of direct sales by Confluent of nitinol products used for medical devices in Illinois, in addition to the Cordis sales of the OptEase filter in this state.

¶ 38 As in *Russell*, these additional direct sales also "relate to" the controversy that Ms. Harding seeks to bring before an Illinois court and are part of the calculus as to whether Illinois courts have specific jurisdiction over this controversy. As in *Russell*, distinguishing between nitinol use in the OptEase filter and in these other medical devices would be "too restrictive and narrow" for a jurisdictional inquiry. Confluent's direct contacts with Illinois customers are sufficiently related to Ms. Harding's claims in this case to be relied on as additional support for specific jurisdiction.

¶ 39 In short, Confluent's national distribution, through Cordis, of the custom-made nitinol

component of the OptEase filter, paired with Confluent's not-insignificant sales of nitinol directly to Illinois customers for use in medical devices, are sufficient minimum contacts that are related enough to this lawsuit such that Illinois courts have specific personal jurisdiction over Confluent for these claims.

¶ 40 Confluent relies on a variety of cases to argue that the requisite relationship between its contacts with Illinois and Ms. Harding's claims is not present here: In its brief, Confluent relied heavily on *Wiles v. Morita Iron Works Co.*, 125 Ill. 2d 144 (1988), *Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. ___, 137 S. Ct. 1773 (2017), and *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. ___, 141 S. Ct. 1017 (2021). At oral argument, Confluent also particularly stressed the applicability of *Young v. Ford Motor Co.*, 2017 IL App (4th) 170177. These cases are all distinguishable, and none of them alter our analysis.

¶ 41 In *Wiles*, a Japanese corporate defendant manufactured machines that were delivered to the plaintiff's New Jersey employer in Japan, who then delivered the offending machine to Illinois, where the plaintiff was injured. *Wiles*, 125 Ill. 2d at 147. The Japanese defendant was not aware of the employer's actions that led to its machine ending up in Illinois. It did not own or operate any manufacturing plant or other business in Illinois, and it had no other connections to Illinois. *Id.* at 147-48, 159-61.

¶ 42 Confluent cites *Wiles* for our supreme court's observation that "purposeful availment" for jurisdictional purposes requires "at a *minimum*" that a defendant have knowledge that its product is marketed in Illinois. (Emphasis in original.) *Id.* at 160. But the court clarified this limitation further in *Russell*, where it relied on this language to hold that "the unilateral action of a third party does not satisfy the minimum contacts standard." *Russell*, 2013 IL 113909, ¶¶ 55-57. As the court in *Russell* ruled, the fact that the defendant does not have actual knowledge that the offending

product is specifically being sold in Illinois is simply not dispositive. *Id.* ¶¶ 13, 19, 85.

¶ 43    In *Bristol-Myers*, the United States Supreme Court found that California could not exercise personal jurisdiction over a nonresident defendant because there were nonresident plaintiffs involved in the suit and there was not "any adequate link between the State and the nonresidents' claims." 582 U.S. at ___, 137 S. Ct. at 1781. As the Supreme Court explained, specific jurisdiction was lacking where the relevant plaintiffs were not only nonresidents themselves and did not claim to have suffered harm in the forum state, but "[i]n addition, *** all the conduct giving rise to [their] claims occurred elsewhere." *Id.* at 1782. In contrast, Ms. Harding was an Illinois resident injured in Illinois, and Confluent had the connections to this state that we have outlined above.

¶ 44    In *Ford*, the Supreme Court concluded that two different states *could* exercise personal jurisdiction over Ford Motor Company because, although the two specific vehicles at issue were not themselves sold by Ford in the forum states, Ford did market and sell the same two models in those states. 592 U.S. at ___, 141 S. Ct. at 1028-29. Confluent argues that *Ford* thus "stands for the proposition that the plaintiff need not show that the defendant sold the *specific unit of the accident-causing product* in the forum state, provided it marketed and sold *other units of that same product* in the forum state." (Emphases in original.) We agree. But nothing in *Ford* suggests that the only way to demonstrate that a defendant has minimum contacts with a forum state is through sales of the injurious product. Rather, as in this case, jurisdiction can be based on a combination of the sales of the offending product and other sales of similar products that, in total, provide evidence that the defendant "purposefully directed its activities" at the forum state and that the plaintiff's claim sufficiently relates to the defendant's varied contacts with the forum state.

¶ 45    In *Young*, as in this case and in *Russell*, it appears that the company that sold the offending product in Illinois was acting as a distributor for a custom-made product manufactured by the out-

of-state defendant. 2017 IL App (4th) 170177, ¶ 13. This was a key part of the *Russell* decision that the Fourth District in *Young* did not address when it distinguished *Russell* and affirmed the circuit court's finding that there was no personal jurisdiction over the Chinese defendant in that case. *Id.* ¶ 44. First, we are of course not bound by the holding in *Young*. *People v. Leavitt*, 2014 IL App (1st) 121323, ¶ 48 (noting that "[w]e are only obliged to follow the decisions of the Supreme Court of Illinois and of the United States Supreme Court"). More importantly, the *Young* case is different from this one. In *Young*, the court stressed that the Chinese defendant had "no direct product sales with customers based in Illinois." *Young*, 2017 IL App (4th) 170177, ¶ 9. In contrast, here, Confluent engaged in direct product sales of nitinol products for medical devices in Illinois. Thus, there is no conflict between our decision in this case and that of the court in *Young*.

¶ 46                                B. Illinois Is a Reasonable Forum

¶ 47    The *Russell* court separately conducted a reasonableness inquiry, after finding the requisite minimum contacts, to ensure that it was reasonable to require the defendant to litigate in Illinois. *Russell*, 2013 IL 113909, ¶¶ 87-91. According to our supreme court in that case,

> "[t]he factors to consider when deciding reasonableness include: (1) the burden imposed on the defendant by requiring it to litigate in a foreign forum; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in obtaining relief; and (4) the interests of the other affected forums in the efficient judicial resolution of the dispute and advancement of substantive social policies." *Id.* ¶ 87.

¶ 48    Confluent has not put forward any evidence of a burden that it would have in litigating in Illinois. Indeed, the only basis on which Confluent suggests that it is unreasonable to require it to litigate here is that it lacks the requisite minimum contacts with this state, an argument that we have already rejected.

¶ 49    As to the other relevant factors, the circuit court observed:

> "Here, Illinois has a strong interest in resolving litigation from the alleged failure of a medical device causing serious and permanent injury to an Illinois resident. Other than Illinois and California there does not appear to be any other forum that would have an interest in the controversy. Because the incident occurred in Illinois and involved an individual living in Illinois, Illinois has a substantial interest in this dispute that implicates the societal concerns of product liability and the safe medical care, issues that are clearly of interest to the citizens of Illinois."

We agree with the circuit court's observations, none of which are disputed by Confluent. In short, requiring Confluent to defend itself in Illinois is reasonable.

¶ 50                                IV. CONCLUSION

¶ 51    Confluent had sufficient minimum contacts with Illinois, such that there is no due process violation in requiring it to defend itself in Illinois courts in this lawsuit. It is also reasonable to require Confluent to defend itself in this state in this case. The circuit court correctly found that Illinois may exercise specific personal jurisdiction over Confluent.

¶ 52    Affirmed.

---

**No. 1-21-0032**

---

| | |
|---|---|
| **Cite as:** | *Harding v. Cordis Corp.*, 2021 IL App (1st) 210032 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-L-8306; the Hon. Gerald Cleary, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | H. Patrick Morris, Garrett L. Boehm Jr., and David F. Fanning, of Johnson & Bell, Ltd., of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | David R. Nordwall, of Law Office of David R. Nordwall, LLC, of Chicago, for appellee. |

---